983 So.2d 505 (2008)
Thomas BEVEL, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-2213.
Supreme Court of Florida.
March 20, 2008.
Rehearing Denied May 23, 2008.
*509 Jefferson E. Morrow, Jacksonville, Florida, for Appellant.
*510 Bill McCollum, Attorney General, Ronald A. Lathan, Jr., and Charmaine M. Millsaps, Assistant Attorneys General, Tallahassee, Florida, for Appellee.
PER CURIAM.
This is a direct appeal of convictions of two counts of first-degree murder and one count of attempted first-degree murder and sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and death sentences.

FACTS AND PROCEDURAL HISTORY
Thomas Bevel was charged with the February 2004 first-degree murders of Garrick Stringfield and his son Phillip Sims and attempted first-degree murder of Feletta Smith.
The key events of February 28, 2004, which ended in two murders and one attempted murder, established the following. Thomas Bevel, who was twenty-two years old at the time of the crime, resided with Garrick Stringfield, who was thirty. The two were close friends, such that Stringfield referred to Bevel as "nephew" or "Tom Tom" and Bevel referred to Stringfield as "Unc." On February 28, 2004, both men were at a street parade in Jacksonville where they ran into Feletta Smith, whom they both knew from their childhood. Smith exchanged telephone numbers with Stringfield and made plans to meet later that evening.
After leaving the parade, Bevel and Stringfield purchased a bottle of gin and went back to Stringfield's house later in the evening. Because Stringfield was going out, he asked Bevel to wait for his thirteen-year-old son, Phillip Sims, who was being dropped off by his mother, Sojourner Parker. Although Parker noticed that Stringfield's car was not in the driveway when she arrived at the house, she was unconcerned because Bevel, a person she considered Stringfield's roommate, answered the door and let her son inside.
Around 9 p.m., Stringfield met Smith at a Walgreens store and she followed him back to his house. When they arrived at Stringfield's house, Bevel and Sims were playing video games in the living room where Smith and Stringfield joined them. Although no illegal drugs were being consumed, Smith stated that Bevel and Stringfield were drinking gin out of the bottle and she had a half cup of gin and grapefruit juice. At some point, Smith and Stringfield went into his bedroom to watch television. Stringfield showed Smith an AK-47 rifle that he kept under his bed and, because Smith was scared of it, he handed the gun to Bevel who removed it from the room. Stringfield and Smith remained in the bedroom with the door closed. Smith said that she last saw Sims playing video games in the living room.
Bevel then drove Stringfield's car to a BP gas station to meet his girlfriend, Rohnicka Dumas, took her to a bar where he purchased another bottle of gin, and brought her back to the house. When they returned, Stringfield and Bevel went into the backyard, Dumas went inside, Smith remained in Stringfield's bedroom, and Sims continued to play video games in the living room. Stringfield and Bevel then came back into the house and each had a gun in his possession; Stringfield was carrying a smaller handgun and Bevel had the AK-47 rifle that Stringfield had handed to him earlier in the evening. Bevel and Dumas went into the other bedroom, located across the hall from Stringfield's room, and talked.
Bevel then left the bedroom with the AK-47 rifle in his hand. He went to Stringfield's bedroom, where Smith and *511 Stringfield were lying in bed nearly asleep, knocked on the door and said, "Unc, open the door." Stringfield got up from the bed, unarmed, and opened the door in his pajamas. Bevel immediately shot Stringfield in the head and he instantly fell to the floor in the doorway. Smith began screaming and Bevel yelled, "Bitch, shut up" while he shot her several times as she lay in the bed. Smith became quiet and pretended to be dead. She testified that there was "no doubt in [her] mind" that Bevel was the shooter. Rohnicka Dumas corroborated Smith's testimony. She observed Bevel pick up the rifle, go out into the hallway, knock on Stringfield's bedroom door and say, "Unc, look here." She testified that multiple shots were fired, during which she heard both the woman in the other room screaming and Bevel yell, "Bitch, shut up."
Bevel then went into the living room where Sims was still sitting on the sofa with the television remote in his hand and shot him twice, once grazing his arm and chest and once in the face. Subsequently, Bevel returned to the bedroom where Dumas had been and they walked out the front door. Bevel locked the burglar bar door, a barred security gate located on the outside of the front door to the house, and drove away in Stringfield's car with Dumas sitting in the passenger seat. While driving to Dumas's house, Bevel held the AK-47 rifle under his chin and stated that he did not mean to kill the boy (Sims), but had to because he was going to be a witness. Bevel abandoned Stringfield's car near Dumas's house.
Smith was eventually able to reach 911 by using Stringfield's cell phone. Because Smith was unable to give the police an exact address, it took some time for the police and rescue to find the house. Ultimately, rescuers were able to transport her to the hospital where she stayed for almost a month while undergoing multiple surgeries for various gunshot wounds to her pelvis and upper legs.
After hiding for almost a month, Bevel was finally found by officers from the Jacksonville Sheriff's Office on March 27, 2004. Bevel was informed of his constitutional rights and indicated his understanding of each right by signing the rights form. The police questioned Bevel on two occasions over the course of twenty-four hours. During these two interviews, Bevel gave four different versions of the story but ultimately confessed to the murders.
Although Bevel confessed to murdering Stringfield and Sims, his version of events was contrary to the testimony of both Smith and Dumas. Bevel stated that he and Stringfield had been fighting recently about money that Stringfield believed he was owed and that Bevel feared that Stringfield was going to try and kill him. He said that when he brought Dumas back to the house that night, Stringfield began to get angry, saying that he should have killed Bevel a long time ago. While Dumas and Smith were in opposite bedrooms, the fight escalated until Stringfield was pointing the handgun at Bevel and Bevel had picked up the AK-47 rifle. Then, Stringfield went into his bedroom and, when Bevel heard a clicking noise that sounded like a magazine being loaded into the handgun, Bevel moved towards the room and shot Stringfield when he reached the door. Bevel said the gun went off several times but he did not mean to shoot Smith.
At trial, the State presented the testimony of several forensic and medical experts, who testified regarding the causes of death of Stringfield and Sims and the extensive injuries suffered by Smith. Dr. Jesse Giles, who performed the autopsy of Sims, testified that Sims received a gunshot wound that grazed his chest and exited his arm but that he died as a result of massive trauma due to a gunshot wound to the *512 head. Dr. Aurelian Nicolaescu, who performed the autopsy of Stringfield, testified that he died as a result of a gunshot wound to the head. Both doctors testified that each victim had stippling injuries, which is indicative of being shot at close to intermediate range. The State also presented evidence technicians and crime-scene analysts who discussed bullet fragments, casings, and fingerprints lifted from the scene. In addition, the State introduced the two videotaped interviews with Bevel and letters that Bevel wrote to Dumas from prison, in which he attempted to convince her to change her testimony and lie at trial to save his life.
In his defense, Bevel presented testimony to contradict Smith's version of events. Officer Kenneth Bowen, one of the first officers to arrive at the crime scene, stated that Smith told him that two black males with ski masks committed the crimes. Francis Smith, Smith's mother, stated that she overheard her daughter tell Bevel's brother and his friend in the hospital that the man who committed the murder had on a mask. Finally, Ketrina Bronner, a neighbor of Stringfield, stated that she had a conversation with Smith at a federal courthouse in which Smith said that she did not see who committed the murder.
After the guilt-phase portion of the trial, the jury found Bevel guilty of first-degree murder of Stringfield by discharging a firearm, first-degree murder of Sims by discharging a firearm, and attempted first-degree murder of Smith by discharging a firearm. During the penalty phase, the State presented the testimony of Detective Kuczkowski, who investigated a previous armed robbery charge involving Bevel,[1] and Detective Dingee, who recounted Bevel's confession that he killed Sims because he would have been a witness. Additionally, the State played the portion of the videotape in which Bevel stated that he killed Sims because he knew who Bevel was and would tell Stringfield's brother that he killed Stringfield. The State also presented three victim impact statements.[2]
In defense, Bevel presented the testimony of several family members who described Bevel's poor childhood, the physical abuse he suffered and witnessed at the hands of his mother's boyfriend, the bond he held with his mother and how her death affected him at the age of twelve, his poor relationship with his father who was a heroin addict, and his positive relationships with his extended family.[3] Bevel also presented the testimony of Dr. Harry Krop, a psychologist, who conducted neuropsychological evaluations and other personality tests to evaluate Bevel for competency to stand trial and his mental state at the time of the crimes, and to explore his psychological status and background to prepare to possibly testify during the penalty phase.
Among other things, Dr. Krop testified about Bevel's low full-scale IQ of 65, which placed him in the range of mild mental *513 retardation; however, he stated that Bevel could not be diagnosed as mentally retarded because, based on Bevel's letters and writings from prison, he believed Bevel "had a lot of street sense and . . . clearly has a higher level of adaptive functioning." Dr. Krop stated that Bevel's mental age is somewhere around that of a fourteen- or fifteen-year-old and that he would function well in a structured environment such as the general population at prison. However, on cross-examination, Dr. Krop admitted that Bevel was clearly responsible for the crimes he committed; he also appreciated the criminality of the conduct, had no organic brain damage or other serious mental infirmity, and was not suffering from any mental illness at the time of the crime.
The jury recommended the death penalty by a vote of eight to four as to the murder of Stringfield and twelve to zero as to the murder of Sims. The trial court found one aggravator applicable to both murder counts, namely, that the defendant was previously convicted of a capital offense or of a felony involving the use or threat of violence to some person. The trial court gave this aggravator "very great weight." As to the murder of Sims, the trial court found an additional aggravating circumstance, that the murder was committed for the purpose of avoiding a lawful arrest, and gave it "great weight." As to mitigation, the trial court found that the age of the defendant statutory mitigator was not proven by a preponderance of the evidence because Bevel was twenty-two at the time of the murder and the trial court did not find that Bevel's mental age was significantly lower. However, the court found six nonstatutory mitigating circumstances applicable.[4] The trial court concluded that the aggravating circumstances strongly outweighed the mitigating circumstances as to the murder of Stringfield and that the aggravators far outweighed the mitigators as to the murder of Sims. In fact, the trial court noted that either aggravator standing alone would outweigh the mitigators in the murder of Sims. Accordingly, the trial court followed the jury's recommendations and sentenced Bevel to death for both counts of first-degree murder. On appeal, Bevel has raised nine issues for review.[5]

ANALYSIS

GUILT PHASE ISSUES

I. Failure to Strike Prospective Juror for Cause
In his first issue on appeal, Bevel asserts that the trial court committed reversible *514 error in failing to excuse prospective juror Jose Ramos "for cause" after he stated that he had worked with law enforcement for so long that he would tend to favor them. We do not reach the issue of whether the denial of a cause challenge was in error because this issue was not preserved for appeal.
This Court has previously held that "[i]n order to preserve such an issue for appeal, Florida law requires a defendant to object to the jurors, show that he or she has exhausted all peremptory challenges and requested more that were denied, and identify a specific juror that he or she would have excused if possible." Kearse v. State, 770 So.2d 1119, 1128 (Fla.2000); accord Kopsho v. State, 959 So.2d 168, 172-73 (Fla.2007). In this case, after the trial court denied Bevel's challenge for cause of prospective juror Ramos, the defense used its last peremptory strike to remove Ramos from the venire. Defense counsel then requested additional peremptory challenges and, although the trial court initially denied the request and allowed the defense to undo a challenge on a juror it had previously peremptorily stricken, the trial court ultimately granted Bevel the additional peremptory challenge. Because Bevel was granted an additional challenge and failed to identify any additional objectionable jurors he would have excused, this claim was not preserved.

II. Admission of Certain Photographic Evidence
Bevel next argues that the trial court erred in admitting photographs depicting the dead body of one of the victims and bloodstains. Although Bevel does not mention the photographs by exhibit number, he asserts that the photographs at issue in this appeal are those that were objected to at trial based on relevance. There are two crime scene photographs that defense counsel objected to based on relevance: (1) a photograph depicting the view of Stringfield's bedroom from the hallway and portraying the condition of the bed as well as Stringfield's body at the very bottom of the frame; and (2) a photograph depicting the blood-stained mattress containing what appear to be four bullet holes.[6] Bevel now argues that the probative value of these photographs was substantially outweighed by the danger of unfair prejudice. However, we have reviewed the photographs and not only are both clearly relevant but neither is shocking or particularly inflammatory. The photograph of Stringfield's bedroom shows the perspective of the shooter and also indicates the position of the victim in the doorway. The other photograph shows the number of bullet holes in the mattress and, although it contained a bloodstain, had no depiction of the victim. The trial court conducted a careful review before admitting these photographs into evidence, and we find no abuse of discretion under the parameters we have set for admission of photographic evidence. See Philmore v. State, 820 So.2d 919, 930-31 (Fla.2002) (citing Ruiz v. State, 743 So.2d 1, 8 (Fla.1999)); see also Floyd v. State, 808 So.2d 175, 183-84 (Fla.2002).

*515 III. Suppression of Bevel's Confession
Bevel also contends that the trial court erred in admitting his confession because his IQ of 65 was so low that he lacked the mental ability to knowingly and voluntarily waive his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Before the trial began, Bevel filed a motion to suppress his statements to police, arguing that he fell within the mild range of mentally retarded with a full-scale IQ of 65 and therefore could not have knowingly and voluntarily waived his constitutional rights.
The trial court held an evidentiary hearing on the motion to suppress. Detectives Coarsey, Chizik, and Dingee testified regarding Bevel's acknowledgement and waiver of his Miranda rights. Detective Coarsey, who conducted the initial interview and was present for all subsequent questioning through closed-circuit television, inquired as to Bevel's education and whether he was under the influence of any drugs or alcohol. Coarsey also asked Bevel if he could read and then had him read the top line of the form out loud. Coarsey then read the constitutional rights form to Bevel, asked if he understood each right after it was read, and had Bevel initial the form next to each right to ensure that he understood. All three detectives confirmed that Bevel never asked to speak to an attorney at any time while being questioned, never said that he wanted to end the discussion with the officers, and was never promised anything in return for his statements. The State also played portions of two videotaped statements, in which Bevel first described being assaulted by two masked men who committed the murders and then went on to ultimately confess.
Bevel then presented a letter from Dr. Krop, the defense's psychological expert, who conducted neuropsychological and personality evaluations of Bevel but was unable to attend the hearing. In the letter, Dr. Krop gave a portion of his opinion concerning Bevel's childhood, mental health, and his full-scale IQ score of 65. The trial court also heard the testimony of Dr. William Riebsame, a court-appointed psychologist for the State, who evaluated and administered psychological tests on Bevel. Dr. Riebsame also reviewed Bevel's family history, the videos of his confessions, the letters he wrote while in prison, and the letter from Dr. Krop, and determined that Bevel had a verbal IQ of 75. Dr. Riebsame testified that, although Bevel appears to have a learning disability, shows signs of antisocial disorder, and may need glasses, his IQ was underestimated due to his limited attention span and the lack of effort he put into the exam. The trial court denied the motion to suppress, determining that Bevel was familiar with the Miranda warnings and that, despite his low IQ, the evidence was "overwhelming that the defendant made his statements freely, intelligently and voluntarily and knowingly waived his right to remain silent."
It is the State's burden to establish by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his or her Miranda rights. See Ramirez v. State, 739 So.2d 568, 575 (Fla.1999). This Court has set forth a two-step approach governing rulings on motions to suppress, in which the Court must determine whether: "(1) competent, substantial evidence supports the trial court's findings of historical fact; and (2) the trial court reached the correct legal conclusion that [a defendant] knowingly, intelligently, and voluntarily waived his [or her] Miranda rights." Thomas v. State, 894 So.2d 126, 136 (Fla.2004) (citing Connor v. State, 803 So.2d 598, 608 (Fla.2001)). Certainly, IQ is a relevant "factor to be *516 considered in determining the voluntariness of a confession." Ross v. State, 386 So.2d 1191, 1194 (Fla.1980). However, this Court has repeatedly stated that the trial court must look to the totality of the circumstances in determining whether a defendant knowingly waived his or her Miranda rights. See, e.g., Thomas, 894 So.2d at 136. In other words, there is no per se rule that equates a specific level of intelligence with a knowing and intelligent waiver of Miranda rights.
In the instant case, two expert opinions were introduced indicating that Bevel's full-scale IQ falls somewhere between 65 and 75, within the mild range of mental retardation. However, Bevel's IQ is but one factor to be considered in determining the voluntariness of his confession. Thompson v. State, 548 So.2d 198, 204 (Fla.1989). Despite his low IQ, the totality of the circumstances, based upon the testimony presented at the hearing as well as a review of the videotaped confessions, indicates that Bevel knowingly and voluntarily waived his Miranda rights.
The investigating officers testified that they asked Bevel about his education, confirmed that he did not appear to be under the influence of any drugs or alcohol, and ensured that he could read. The officers then read Bevel the constitutional rights form and received confirmation from Bevel that he understood each right after it was read. In fact, Bevel initialed the form next to each right to ensure that he understood. See Thomas, 894 So.2d at 136 ("Although a written statement is neither necessary nor by itself sufficient to establish waiver, it is strong proof that a waiver is valid.") (citing North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)).
Additionally, Dr. Riebsame confirmed that Bevel could understand language fairly well and that he had an adequate vocabulary as evidenced by the letters he wrote to his girlfriend from prison. He also could not "identify any areas of deficiency in terms of adaptive behavior that would suggest mental retardation." The testimony adduced at the hearing confirms that Bevel was never coerced, influenced, or pressured into making any statements. And, as noted by the trial court, Bevel never requested to speak to an attorney or otherwise indicated that he did not wish to speak with the officers even though he had had past experiences with police interrogation. See Carter v. State, 697 So.2d 529, 534 (Fla. 1st DCA 1997) (noting that prior experience with law enforcement is one factor in determining whether a waiver is knowing and voluntary); see also State v. Crosby, 599 So.2d 138, 142 (Fla. 5th DCA 1992) (same). Although Bevel's full-scale IQ is low, there is competent, substantial evidence in the record to the support the trial court's findings, and we conclude that the trial court properly found that he understood his rights and voluntarily waived them. Accordingly, we affirm the trial court's denial of the motion to suppress.

IV. Sufficiency of the Evidence
Although Bevel does not raise the issue of sufficiency of the evidence on appeal, we have an obligation to independently review the record for sufficiency of the evidence. See Jones v. State, 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(6) ("In death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief."). "[T]he question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) *517 (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)), cert. denied, ___ U.S. ___, 127 S.Ct. 1334, 167 L.Ed.2d 80 (2007). Importantly, in addition to Bevel's own confession, there were two witnesses to the shootings in this case  one eyewitness who saw Bevel shoot Stringfield and then turn the gun on her and another witness who saw Bevel carry the gun into the other room only seconds before the shots were fired. After a review of the record, we conclude that competent, substantial evidence supports the two first-degree murder convictions in this case and we thus affirm Bevel's convictions.

PENALTY PHASE ISSUES

I. Aggravating and Mitigating Circumstances
In his next issue on appeal, Bevel raises several arguments regarding the trial court's findings as to the aggravators and mitigators. He first asserts that the trial court erred by finding the aggravating circumstances applicable. Bevel also contends that the trial court gave too little weight to certain mitigating circumstances, such as his low IQ, and failed to find others that were clearly proven. Lastly, Bevel argues that the trial court erred in concluding that the aggravators outweighed the mitigators. We address these contentions separately below.

A. Aggravating Circumstances
Without identifying to which aggravating circumstance he is referring, Bevel generally contends that the Court should vacate the aggravators and his death sentence. We have reviewed the trial court's detailed and well-reasoned sentencing order, in which it found the following aggravating circumstances proven beyond a reasonable doubt. As to the murder of Stringfield, the court found one aggravating circumstance: the prior violent felony aggravator, based upon a prior attempted robbery conviction and the contemporaneous convictions of first-degree murder of Sims and attempted murder of Smith. As to the murder of Sims, the court found two aggravating circumstances: (1) prior violent felony, based upon a prior attempted robbery conviction and the contemporaneous convictions of first-degree murder of Stringfield and attempted murder of Smith; and (2) murder to avoid a lawful arrest.
"In reviewing an aggravating factor challenged on appeal, this Court's task `is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance, and, if so, whether competent substantial evidence supports its finding.'" Douglas v. State, 878 So.2d 1246, 1260-61 (Fla.2004) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)). Section 921.141(5)(b), Florida Statutes (2005), provides the following as a statutory aggravating circumstance: "The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." This Court has repeatedly held that "where a defendant is convicted of multiple murders, arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim." Francis v. State, 808 So.2d 110, 136 (Fla.2001) (citing Mahn v. State, 714 So.2d 391, 399 (Fla. 1998), and Walker v. State, 707 So.2d 300, 317 (Fla.1997)). In this case, Bevel murdered two victims and attempted to murder a third. Thus, the prior violent felony aggravator was clearly applicable to each count based upon the contemporaneous murder and attempted murder convictions.
In addition to the contemporaneous convictions, the State also introduced *518 evidence that Bevel was previously convicted of attempted robbery in 2003 to support the prior violent felony aggravator. As noted by the trial court,
On October 20, 2002, the defendant confronted Samuel Glover with a firearm. He pointed the gun to the side of Mr. Glover's head and told Mr. Glover to "get butt naked and assume the position." The defendant demanded that the victim give him drugs and a firearm which the defendant believed were missing. The defendant forced the victim to empty his pockets. The victim pleaded to the defendant for his life. The defendant told Mr. Glover to do as he was told, or the defendant would shoot him in the head. The defendant continued with the attempt to rob Mr. Glover despite seeing a lady inside the house who was observing them. This woman called the police, who responded. When the police arrived, the defendant threw his gun on top of a shed and attempted to flee. He was apprehended in the victim's backyard and the gun recovered. The defendant pled guilty to the lesser included offense of Attempted Robbery and was sentenced to twelve months in the Duval County Jail. Less than one year after this conviction, he committed the murders for which he is being sentenced today. From his conduct in the instant case, it is apparent that the defendant was not deterred from violence by his Attempted Robbery conviction, nor did he turn away from violent behavior. The only lesson the defendant apparently learned was the danger involved in leaving witnesses alive.
"[W]hether a crime constitutes a prior violent felony is determined by the surrounding facts and circumstances of the prior crime." Rose v. State, 787 So.2d 786, 800 (Fla.2001). This Court has previously held that an attempted robbery conviction can support the prior violent felony aggravator. Johnson v. State, 442 So.2d 193, 197 (Fla.1983) ("Both robbery and murder involve violence per se; any attempt to commit these crimes must inherently involve the threat of violence."). Although Bevel pled guilty to the lesser included offense of attempted robbery without a firearm, he was originally charged with attempted armed robbery with a firearm. Furthermore, the State introduced evidence at the penalty phase detailing the crime in which Bevel attacked a man in his backyard with a firearm, pointed the gun to the side of the victim's head and told him to "get butt naked and assume the position." Based on the conviction for attempted robbery itself and the testimony presented describing the facts of the crime, we conclude that competent, substantial evidence supports the trial court's finding that the prior violent felony aggravator was applicable based on the attempted robbery conviction. See Reynolds v. State, 934 So.2d 1128, 1149-50 (Fla.2006) (upholding the trial court's finding of the prior violent felony aggravator where the testimony adduced at trial describing the details of the crime indicated that the defendant may have committed more serious crimes than his original conviction).
The trial court also found the avoid arrest aggravator applicable as to the murder of Sims. In order to properly find the avoid arrest aggravator applicable "[w]here the victim is not a police officer, `the evidence supporting the avoid arrest aggravator must prove that the sole or dominant motive for killing was to eliminate a witness,' and `mere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator.'" Buzia v. State, 926 So.2d 1203, 1209 (Fla.2006) (quoting Parker v. State, 873 So.2d 270, 289 (Fla.2004)) (emphasis *519 omitted). In determining whether the evidence supports this aggravator, we look to, among other things, "whether the defendant . . . made any incriminating statements about witness elimination." Id. at 1210 (emphasis omitted). In this case, Bevel made several incriminating statements to Dumas and to the interrogating officers that he only killed Sims because he would have been a witness. He also told Dumas while they were driving away from the house that he had to kill Sims because Sims was going to be a witness. There is competent, substantial evidence to support finding the avoid arrest aggravator. Accordingly, the trial court did not err in its findings as to the aggravators in this case.

B. Mitigating Circumstances
Bevel also asserts that the trial court erred in both failing to find certain proposed mitigating circumstances and improperly weighing the ones it found.

1. Mitigating Circumstances Rejected by the Trial Court
Bevel argues that the trial court erred in concluding that certain mitigators were not proven. Bevel argues, as he did in his sentencing memorandum, that he proved the existence of thirteen mitigating circumstances.[7] However, the trial court found that several mitigating circumstances were not proven by a preponderance of the evidence, including: (1) the age of the defendant at the time of the crime (statutory mitigator); (2) the defendant can be a good inmate in prison, does well in structured environments, and could be rehabilitated; (3) he felt remorse for his actions to the point of being suicidal; and (4) he was abused as a child. Because competent, substantial evidence supports the trial court's findings, we conclude that the trial court did not err in rejecting these mitigating circumstances.
First, the trial court determined that the age of the defendant statutory mitigator was not proven. In its order, the trial court extensively discussed the penalty-phase testimony of Dr. Krop and Dr. Riebsame, the two psychologists who evaluated Bevel. Although Dr. Krop indicated that Bevel had a low IQ, the court acknowledged that Dr. Riebsame believed his IQ to be much higher and that Bevel even appeared to be exaggerating his difficulties. The trial court noted that "[b]oth Dr. Krop and Dr. Riebsame agreed that the defendant did not meet the criteria for mental retardation."[8] The trial *520 court reviewed the testimony adduced at trial, the recorded confessions, and the handwritten letters Bevel sent to his girlfriend, and concluded that Bevel was a "twenty-two year old man of average intelligence." Additionally, witnesses at trial testified that Bevel could support himself, could live alone without assistance, and was not dependent upon others in leading his life. Furthermore, the trial court stated that Bevel
showed criminal sophistication in the commission of and follow-up to these crimes. He obtained a firearm, locked the burglar bar door before he left the house, stole the victim's car, but abandoned it several blocks from Ms. Dumas' home where he would be in hiding, and managed to evade a police dragnet for approximately one month. Again, this [sic] are not the actions of a fourteen year old, nor someone who is emotionally unstable.
Based on the record, there is competent, substantial evidence to support the trial court's rejection of age as a mitigating circumstance.
Second, the trial court found that the mitigating circumstance that Bevel can be a good inmate in prison, does well in structured environments, and could be rehabilitated was also not proven. Although Dr. Krop testified that Bevel could be rehabilitated because he has done well in structured environments, such as jail, he also admitted on cross-examination that Bevel had disciplinary problems in the juvenile programs he attended and behavioral problems in elementary school. As noted by the trial court, Dr. Krop stated that Bevel "failed to conform to social norms with respect to lawful behaviors as indicated by repeated lying; that he has exhibited aggressiveness, as indicated by repeated physical fights or assaults; [and] that he displays a reckless disregard for the safety of himself or others." Officer Fisette, the records custodian for the Florida Department of Corrections, testified that Bevel has received two disciplinary reports since he has been incarcerated for being in an unauthorized area and disregarding an order to stop running laps in the indoor area. Furthermore, Bevel was incarcerated after being convicted of attempted robbery and then committed these murders less than a year after his release. Accordingly, the trial court's rejection of this mitigating circumstance is supported by competent, substantial evidence.
Third, the trial court found that Bevel failed to prove that he was remorseful to the point of suicide. As noted by the trial court, the only evidence that he was suicidal was the fact that he held a rifle to his chin in the car with Dumas just moments after committing the murders. Although this could indicate a moment of suicidal thoughts, the trial court aptly points out that Bevel could have been attempting to influence Dumas's conduct, the moment was short-lived, and his conduct over the next thirty days indicates that he was neither truly remorseful nor suicidal. In fact, when he was speaking to the officers after being arrested and complaining about the suicide watch prison suit that he was being forced to wear, Bevel vehemently denied being suicidal and pleaded with the detectives to take him off suicide watch. Therefore, the trial court's rejection of this mitigating circumstance is also supported by competent, substantial evidence.
*521 Fourth, the trial court found that the mitigating circumstance of Bevel's abuse as a child was not proven by a preponderance of the evidence. The trial court conceded that Bevel "did not have an easy childhood," but concluded that his sister failed to identify any specific instances in which Bevel was abused by his stepfather. However, the sentencing order fails to mention that Bevel's sister testified to an incident where their stepfather, William McKinney, kicked Bevel in the chest and he had to be taken to the hospital because he was having difficulty breathing. Nevertheless, she also admitted that she was very young when the incident occurred and could not remember exactly why they had taken him to the hospital.
On the other hand, several of Bevel's other relatives, including his two aunts and his grandmother, testified that he had endured hardship as a child, but that he had positive and loving relationships with his extended family throughout his childhood. The trial court further noted that even
[i]f [it] were able to find the defendant was abused by the testimony of Tiandra Bevel, that mitigating circumstance would be assigned little weight, because it was clearly established by the evidence that the defendant had loving, nurturing family members who still support him to this day.
Thus, even if the trial court had found the existence of the child abuse mitigator, it would have assigned it little weight.
We conclude that there is competent, substantial evidence to support the trial court's rejection of childhood abuse as a mitigating circumstance based on the vague and relatively unspecific detail of the testimony adduced at trial. Furthermore, even if the trial court erred in rejecting child abuse as mitigation, the error would be subject to a harmless error analysis. See Bryant v. State, 785 So.2d 422, 436 (Fla.2001). In this case, any abuse that might have been suffered was limited to a single incident. Based on the weakness of this alleged mitigator, the lack of any mental mitigation and the substantial nature of the aggravators, we conclude that any error was harmless beyond a reasonable doubt. Cf. Hurst v. State, 819 So.2d 689, 699 (Fla.2002) (concluding that trial court's rejection of good family background as mitigating circumstance was harmless given the severity of aggravators).

2. Weight Given to the Mitigating Circumstances
Bevel also contends that the trial court erred in giving too little weight to the mitigating circumstances and in concluding that the aggravating circumstances outweighed the mitigating circumstances. In its sentencing order, the court found six nonstatutory mitigating circumstances applicable to both murders and assigned each minimal, little or very little weight. This Court reviews a trial court's assignment of weight to mitigation under an abuse of discretion standard. See Blanco v. State, 706 So.2d 7, 10 (Fla.1997). In this case, the trial court explained its reasoning in finding all of the nonstatutory mitigators to be of little weight. We discuss only the weight assigned to the mitigating circumstance of Bevel's low IQ.[9]
*522 In assigning this mitigator little weight, the trial court stated the following:
The defense next presented evidence and argument that the defendant has an IQ of 65. The Court finds that this mitigating circumstance was proven. However, it was also proven that the defendant has been self-supporting and living on his own since the age of eighteen, that he reads and writes well, and that he needed no assistance to take care of himself, having exhibited the ability to hold down a steady job and provide well for himself.
Although it may be questionable for the trial court to assign such little weight to the mitigating circumstance that a defendant has an extremely low IQ of 65, especially where an expert places him or her within the mild range of mental retardation, we find no abuse of discretion in this instance because there was also significant contradictory evidence demonstrating that Bevel's IQ may have been higher and that he was capable of functioning in society. In other words, there was no evidence presented as to any functional deficits that Bevel experienced throughout his life as a result of a low IQ or any demonstration of a relationship to the circumstances of this crime. Moreover, in rejecting his age as a statutory mitigator, the trial court found that Bevel was a "twenty-two year old man of average intelligence"; thus, the court apparently gave Bevel the benefit of the doubt in finding low IQ as a nonstatutory mitigating circumstance.
In this case, there is simply no indication that the trial court abused its discretion in assigning weight to the mitigators. See Perez v. State, 919 So.2d 347, 372 (Fla.2005). Moreover, even if we were to conclude that the trial court erred in failing to give this mitigator greater weight, that error would be harmless beyond a reasonable doubt.
Further, the trial court found that the aggravating circumstances heavily outweighed the mitigating circumstances. In fact, the trial court stated that "[e]ither aggravator, standing alone, would still outweigh the mitigators." This Court has consistently held that weighing the aggravating circumstances against the mitigating circumstances is the trial judge's responsibility and it is not this Court's "function to reweigh those factors." Hoskins v. State, 965 So.2d 1, 19 (Fla.2007); accord Connor v. State, 803 So.2d 598, 612 (Fla.2001). Accordingly, we reject these claims.

II. Adoption of State's Proposed Findings in Sentencing Order
In his next issue on appeal, Bevel argues that the trial court erred in adopting verbatim the State's proposed findings of facts and conclusions of law in its order sentencing Bevel to death. Specifically, Bevel asserts that the following aspects of the aggravating circumstances section of the State's memorandum in support of the imposition of the death penalty as to Sims indicate that the trial court improperly adopted the State's memorandum verbatim: (1) a handwritten note by the judge stating "Insert 2" followed by a handwritten edited sentence;[10] (2) the last sentence of the introductory paragraph had been scratched through;[11] and (3) the trial *523 court adopted virtually verbatim the State's proposed findings of facts.
A trial court has the independent responsibility of "weighing the aggravating and mitigating circumstances." § 921.141(3), Fla. Stat. (2005); accord Morton v. State, 789 So.2d 324, 333 (Fla. 2001). This Court has previously held that a trial court "may not request that the parties submit proposed orders and adopt one of the proposals verbatim without a showing that the trial court independently weighed the aggravating and mitigating circumstances." Valle v. State, 778 So.2d 960, 964 n. 9 (Fla.2001). However, as long as the sentencing order "reflect[s] the trial judge's independent judgment about the existence of aggravating and mitigating factors and the weight each should receive," then the Court should deny relief. Blackwelder v. State, 851 So.2d 650, 653 (Fla.2003).
In the instant case, the sentencing order clearly indicates that the trial judge independently weighed the aggravators and mitigators. Although Bevel is correct that the trial court handwrote notes and crossed out several lines in the prior violent felony section of the State's memorandum on victim Sims, the trial court substantially revised the prior violent felony section of the State's memorandum on victim Stringfield. Furthermore, the trial court did not even follow the State's recommended weight as to the prior violent felony aggravator for either countthe State recommended that the prior violent felony aggravator be given "great weight," yet the trial court gave it "very great weight." It is therefore clear that the trial court independently assessed the aggravating circumstances and did not merely "rubber-stamp" the State's memorandum. See id.
The trial court also discussed several nonstatutory mitigating circumstances that were not addressed in the State's memorandum, including the defendant's low IQ, the defendant's remorse to the point of being suicidal, and his appropriate courtroom behavior. In fact, the State even conceded that Bevel had proven each of the thirteen mitigating circumstances addressed in its memorandum, yet the sentencing order disagreed and found that several mitigating circumstances were not proven. Additionally, although the trial court essentially adopted the State's facts section almost verbatim, Bevel does not indicate that the trial court's statement of the facts is erroneous; more importantly, these findings are supported by the record and the testimony adduced at trial. Because it is clear that the trial court did not merely "rubber-stamp" the State's memorandum but independently considered the evidence and weighed the aggravating and mitigating circumstances, we reject this claim.

III. Proportionality
Bevel asserts that his death sentences are disproportionate. This Court has stated that "[t]he death penalty is reserved for `the most aggravated and unmitigated of most serious crimes.'" Philmore, 820 So.2d at 939 (quoting Clark v. State, 609 So.2d 513, 516 (Fla.1992)). The Court performs proportionality review to prevent the imposition of "unusual" punishments in violation of article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). In conducting proportionality review, the Court has described its function as follows:
Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality *524 review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.
Id. (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). Because the trial court sentenced Bevel to death on each count and found a different number of aggravators applicable to each death sentence, we address each sentence of death separately below. However, in looking at the totality of the circumstances in this case, we must consider the fact that Bevel was convicted of a double homicide and the attempted first-degree murder of a third victim, and that he committed a prior violent felony only one year before the murders. Thus, although the trial court found only one aggravating circumstance, the facts upon which the aggravator is based are critical to our analysis.
As to the first-degree murder of Stringfield, the trial court found one aggravating circumstance, that Bevel had been previously convicted of a capital offense or prior violent felony involving the use or threat of violence. The trial court found no statutory mitigators and only six nonstatutory mitigators, giving most little or very little weight. The jury recommended death by a vote of eight to four.
This Court has previously stated that "death is not indicated in a single-aggravator case where there is substantial mitigation." Almeida v. State, 748 So.2d 922, 933 (Fla.1999) (quoting Jones v. State, 705 So.2d 1364, 1367 (Fla.1998)). However, where the mitigation is not substantial and a prior murder is involved, we have affirmed the death penalty even in a single-aggravator case. See, e.g., Ferrell v. State, 680 So.2d 390 (Fla.1996); see also Duncan v. State, 619 So.2d 279 (Fla.1993). Even though this is a single aggravator case, the aggravator was given "very great weight" because it was supported by Bevel's 2003 conviction for attempted robbery and his contemporaneous convictions for first-degree murder of Sims and attempted first-degree murder of Smith. Furthermore, the prior violent felony conviction aggravator is one of the "most weighty" in Florida's sentencing scheme. Sireci v. Moore, 825 So.2d 882, 887 (Fla.2002). We therefore consider the "very great weight" of the prior violent felony aggravator in conducting our proportionality review. In addition, we must take into account the quality of the mitigation, see Offord v. State, 959 So.2d 187, 191 (Fla.2007), which in this case consists of nonstatutory mitigation that was insubstantial.
We have previously held the death penalty to be proportionate in cases involving multiple murders where the only aggravating circumstance was a prior violent or contemporaneous felony and the mitigation was minimal. See Lindsey v. State, 636 So.2d 1327, 1329 (Fla.1994) (finding death proportionate in a double homicide case, where the only aggravator was based on prior violent felony convictions, including a prior second-degree murder conviction for the first count and the contemporaneous first-degree murder conviction for the second count, and minimal nonstatutory mitigation including the defendant's poor health); see also Porter v. State, 564 So.2d 1060, 1062 n. 2, 1064-65 (Fla.1990) (finding death proportionate in a double homicide case, where two aggravators, prior violent felony and contemporaneous felony, and no mitigation were found). In addition, the Court has held that the death penalty was proportionate in a single aggravator case, based on two prior violent felony convictions, attempted sexual battery and kidnapping, and minimal nonstatutory mitigation, including appropriate courtroom behavior (very little weight) *525 and mental disorders (very little weight). See LaMarca v. State, 785 So.2d 1209, 1216-17 & n. 4 (Fla.2001) (noting that proportionality was supported by the fact that LaMarca committed the murder soon after being released from prison on the prior violent felony convictions); see also Ferrell, 680 So.2d at 391 (finding death proportionate where the only aggravator was a prior violent felony conviction for second-degree murder (weighty) and a number of nonstatutory mitigating circumstances that were all assigned little weight). In light of the totality of the circumstances of this case, including a very weighty prior violent felony aggravator based on a first-degree murder conviction, an attempted first-degree murder conviction, and a prior robbery involving the use of a firearm occurring just one year before the murders, and minimal nonstatutory mitigation, we conclude that death is a proportionate punishment as to the murder of Stringfield.
If the death penalty is a proportionate punishment for the first-degree murder of Stringfield, then a fortiori death is a proportionate punishment for the first-degree murder of Sims. This is because the trial court found an additional aggravating circumstance, murder to avoid arrest, applicable to the murder of Sims. The trial court assigned the prior violent felony aggravator "very great weight" and assigned the avoid arrest aggravator "great weight." As previously discussed, the trial court only found six nonstatutory mitigators applicable and most were given little or very little weight. The jury recommended death by a vote of twelve to zero. Based on the very strong aggravation and minimal nonstatutory mitigation in this case and the jury's unanimous recommendation, we conclude that death is a proportionate punishment as to the murder of Sims. See Reaves v. State, 639 So.2d 1, 6 & n. 11 (Fla.1994) (concluding that death is proportionate in a case involving two aggravating circumstances, prior violent felony for two armed robberies and avoid arrest, with no statutory mitigation and three nonstatutory mitigators).

IV. Bevel's Mental Age
In his next issue on appeal, Bevel argues that the death penalty is an inappropriate penalty for him because his mental age is that of a fourteen- or fifteen-year-old. Specifically, Bevel points to the United States Supreme Court's decision in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which held that executing individuals who were under the age of eighteen at the time of the capital offense is prohibited by the Eighth and Fourteenth Amendments. However, this Court has consistently held that Roper only prohibits the execution of defendants "whose chronological age is below eighteen" at the time of the crime. Hill v. State, 921 So.2d 579, 584 (Fla.2006); see also Kearse v. State, 969 So.2d 976, 992 (Fla.2007). Because this Court has previously rejected the argument that Roper prohibits the execution of a capital defendant whose mental age at the time of the offense was under eighteen and because the trial court specifically rejected a finding that his mental age was that of a de facto child, Bevel's argument here is without merit.

V. Constitutionality of Florida's Death Penalty Statute
Lastly, Bevel contends that the trial court erred in denying his motion for a ruling that Florida's capital sentencing scheme, section 921.141, Florida Statutes (2004), is unconstitutional under the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *526 Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because it allows a judge to make findings as to aggravating circumstances necessary for imposition of the death penalty, rather than requiring those findings to be made by a unanimous jury. Specifically, Bevel argues that his sentence is unconstitutional because, although the jury recommended death by a vote of twelve to zero for the murder of Sims, there was no unanimous finding of the death penalty aggravators as to the murder of Stringfield because the jury recommended death by a vote of eight to four.
Where one of the aggravating circumstances is a "prior violent felony" conviction, this Court has consistently held that Apprendi and Ring do not apply. See, e.g., Bryant v. State, 901 So.2d 810, 823 (Fla.2005); see also Robinson v. State, 865 So.2d 1259, 1265 (Fla.2004); Jones v. State, 855 So.2d 611, 619 (Fla.2003). In this case, the trial court found the prior violent felony aggravator applicable to both death sentences. Because we have held that Apprendi and Ring are inapplicable where one of the aggravating circumstances is a prior violent felony conviction, we reject Bevel's argument. See, e.g., Bryant, 901 So.2d at 823; Robinson, 865 So.2d at 1265. Additionally, the jury voted unanimously to recommend the death penalty as to the murder of Sims and we have previously rejected Apprendi/Ring claims in other direct appeals involving unanimous death recommendations. See, e.g., Crain v. State, 894 So.2d 59, 78 (Fla.2004).

CONCLUSION
For all the foregoing reasons, we affirm Bevel's first-degree murder convictions and his sentences of death.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] In 2003, Bevel was formally charged with armed robbery with a firearm and attempted armed robbery and ultimately pled guilty to the lesser included offense of attempted unarmed robbery. Bevel was sentenced to one year in county jail and committed the murders in this case within a year after being released.
[2] The following family members presented victim impact statements: (1) Prescilla Frink, Stringfield's mother; (2) Florence Sims, Sims' paternal grandmother; and (3) Sojourner Parker, Sims' mother.
[3] These witnesses were: (1) Barbara Fisher, Bevel's aunt; (2) Donna Sapp, Bevel's aunt; (3) Donella McCray, Bevel's grandmother; and (4) Theondra Bevel, Bevel's sister, who testified about their years growing up and how their mother's boyfriend, William McKinney, was verbally and physically abusive to her, Bevel, and their mother.
[4] The nonstatutory mitigators found were: (1) the defendant has religious faith and loves his family members (minimal weight); (2) defendant confessed to the crime (little weight); (3) defendant has exhibited good behavior in jail (very little weight); (4) defendant exhibited good behavior in court (little weight); (5) defendant has an IQ of 65 (little weight); and (6) defendant struggled with the death of his mother (very little weight).
[5] Bevel has raised the following nine issues: (1) whether the trial court erred in failing to strike for cause a juror who favored law enforcement; (2) whether the trial court erred in finding that the aggravators outweighed the mitigators; (3) whether Bevel's death sentence is disproportionate; (4) whether the trial court erred in denying Bevel's motion that Florida's death penalty statute is unconstitutional because a jury, rather than a judge, must make a unanimous finding as to the aggravators; (5) whether the trial court erred in the weight assigned to the aggravators and mitigators; (6) whether the trial court abused its discretion in allowing photographic evidence which was gruesome and unduly prejudicial; (7) whether the trial court erred in admitting Bevel's confession; (8) whether the trial court erred in adopting verbatim the State's proposed findings of fact and conclusions of law; and (9) whether the death penalty is inappropriate because Bevel's mental age is under that of an eighteen-year-old.
[6] There were five additional autopsy photographs depicting various gunshot wounds of Sims that defense counsel objected to as cumulative and prejudicial. The trial court overruled the objection as to four of these photographs, exhibits P, R, S, and U, because they clearly showed the wounds and were "pretty clinical," but sustained the objection as to exhibit O because it was cumulative with P. Although Bevel does not specifically indicate the exhibit numbers for the photographs he now asserts were error to admit, he does mention that the photos at issue in this appeal were objected to based on relevance. Because the above-mentioned photographs were objected to as cumulative and prejudicial, as opposed to being irrelevant, we do not address the propriety of admitting these photographs.
[7] Bevel asserts that he proved the existence of the following thirteen mitigating circumstances: (1) the age of the defendant at the time of the crime, and more specifically, that he had a mental age of 14 to 15 years old; (2) Bevel's religious faith; (3) the reciprocal love between Bevel and his sisters, brothers, aunts and uncles; (4) Bevel confessed to his involvement in the crimes charged; (5) Bevel exhibited good jail conduct; (6) Bevel exhibited appropriate courtroom behavior; (7) Bevel could be a good inmate in prison; (8) Bevel had an IQ of 65; (9) Bevel was abused as a child (physically and mentally); (10) Bevel struggled with the death of his mother; (11) Bevel felt remorse for his actions to the point of being suicidal; (12) Bevel is young and does well in a structured environment and therefore can be rehabilitated; and (13) Bevel has not been a discipline problem in the detention facility for the 18 months that he has been there.
[8] Bevel heavily relies upon the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in which the Court held that it was unconstitutional to execute mentally retarded criminals. However, in this case, Bevel could not raise an Atkins claim because he was never diagnosed as mentally retarded. In fact, Bevel concedes in his initial brief on appeal to this Court that Dr. Krop could not diagnose Bevel as mentally retarded "because he had looked at some of his writings and Bevel had a lot of street sense and a higher level of adaptive functioning, although unfortunately his adaptive level was also maladaptive functioning." Initial Brief of Appellant Bevel at 10, Bevel v. State, No. SC05-2213 (Fla. Nov. 2, 2006), 2006 WL 3293486.
[9] Those other nonstatutory mitigators were: (1) defendant has religious faith and loves his family members (minimal weight); (2) defendant confessed to the crime (little weight); (3) defendant has exhibited good behavior in jail (very little weight); (4) defendant exhibited good behavior in court (little weight); and (5) defendant struggled with the death of his mother (very little weight).
[10] The State's original memorandum read as follows: "The State proved that Defendant had previously been convicted of two crimes of violence against a person and of a capital offense." The trial court then struck through the words "State proved" and added the handwritten words "Court finds beyond a reasonable doubt."
[11] The following sentence in the State's memorandum was stricken-through: "The State submits that this Court should give this aggravating circumstance great weight."