# Supreme Court of Florida

_____

No. SC14-770
_____

**THOMAS BEVEL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC14-2106
_____

**THOMAS BEVEL,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[June 15, 2017]

PER CURIAM.

In this appeal from the denial of an initial motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851, death-sentenced prisoner Thomas Bevel raises the sole claim that his attorney provided

constitutionally ineffective assistance during the penalty phase of his capital murder trial. Bevel also raises, in an accompanying petition for a writ of habeas corpus, a claim of ineffective assistance of appellate counsel for not presenting an issue on direct appeal pertaining to allegedly improper prosecutorial comments. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained in this opinion, we deny the habeas petition, but reverse the postconviction court's order denying Bevel's motion for postconviction relief, vacate Bevel's death sentences, and remand for a new penalty phase proceeding.

## I. FACTS AND PROCEDURAL HISTORY

The facts of Bevel's crimes were set forth in this Court's opinion affirming the convictions and sentences on direct appeal:

> Thomas Bevel was charged with the February 2004 first-degree murders of Garrick Stringfield and his son Phillip Sims and attempted first-degree murder of Feletta Smith.
> The key events of February 28, 2004, which ended in two murders and one attempted murder, established the following. Thomas Bevel, who was twenty-two years old at the time of the crime, resided with Garrick Stringfield, who was thirty. The two were close friends, such that Stringfield referred to Bevel as "nephew" or "Tom Tom" and Bevel referred to Stringfield as "Unc." On February 28, 2004, both men were at a street parade in Jacksonville where they ran into Feletta Smith, whom they both knew from their childhood. Smith exchanged telephone numbers with Stringfield and made plans to meet later that evening.
> After leaving the parade, Bevel and Stringfield purchased a bottle of gin and went back to Stringfield's house later in the evening. Because Stringfield was going out, he asked Bevel to wait for his thirteen-year-old son, Phillip Sims, who was being dropped off by his mother, Sojourner Parker. Although Parker noticed that Stringfield's

- 2 -

car was not in the driveway when she arrived at the house, she was unconcerned because Bevel, a person she considered Stringfield's roommate, answered the door and let her son inside.

Around 9 p.m., Stringfield met Smith at a Walgreens store and she followed him back to his house. When they arrived at Stringfield's house, Bevel and Sims were playing video games in the living room where Smith and Stringfield joined them. Although no illegal drugs were being consumed, Smith stated that Bevel and Stringfield were drinking gin out of the bottle and she had a half cup of gin and grapefruit juice. At some point, Smith and Stringfield went into his bedroom to watch television. Stringfield showed Smith an AK–47 rifle that he kept under his bed and, because Smith was scared of it, he handed the gun to Bevel who removed it from the room. Stringfield and Smith remained in the bedroom with the door closed. Smith said that she last saw Sims playing video games in the living room.

Bevel then drove Stringfield's car to a BP gas station to meet his girlfriend, Rohnicka Dumas, took her to a bar where he purchased another bottle of gin, and brought her back to the house. When they returned, Stringfield and Bevel went into the backyard, Dumas went inside, Smith remained in Stringfield's bedroom, and Sims continued to play video games in the living room. Stringfield and Bevel then came back into the house and each had a gun in his possession; Stringfield was carrying a smaller handgun and Bevel had the AK–47 rifle that Stringfield had handed to him earlier in the evening. Bevel and Dumas went into the other bedroom, located across the hall from Stringfield's room, and talked.

Bevel then left the bedroom with the AK–47 rifle in his hand. He went to Stringfield's bedroom, where Smith and Stringfield were lying in bed nearly asleep, knocked on the door and said, "Unc, open the door." Stringfield got up from the bed, unarmed, and opened the door in his pajamas. Bevel immediately shot Stringfield in the head and he instantly fell to the floor in the doorway. Smith began screaming and Bevel yelled, "Bitch, shut up" while he shot her several times as she lay in the bed. Smith became quiet and pretended to be dead. She testified that there was "no doubt in [her] mind" that Bevel was the shooter. Rohnicka Dumas corroborated Smith's testimony. She observed Bevel pick up the rifle, go out into the hallway, knock on Stringfield's bedroom door and say, "Unc, look here." She testified that multiple shots were fired, during which she heard both

the woman in the other room screaming and Bevel yell, "Bitch, shut up."

Bevel then went into the living room where Sims was still sitting on the sofa with the television remote in his hand and shot him twice, once grazing his arm and chest and once in the face. Subsequently, Bevel returned to the bedroom where Dumas had been and they walked out the front door. Bevel locked the burglar bar door, a barred security gate located on the outside of the front door to the house, and drove away in Stringfield's car with Dumas sitting in the passenger seat. While driving to Dumas's house, Bevel held the AK–47 rifle under his chin and stated that he did not mean to kill the boy (Sims), but had to because he was going to be a witness. Bevel abandoned Stringfield's car near Dumas's house.

Smith was eventually able to reach 911 by using Stringfield's cell phone. Because Smith was unable to give the police an exact address, it took some time for the police and rescue to find the house. Ultimately, rescuers were able to transport her to the hospital where she stayed for almost a month while undergoing multiple surgeries for various gunshot wounds to her pelvis and upper legs.

After hiding for almost a month, Bevel was finally found by officers from the Jacksonville Sheriff's Office on March 27, 2004. Bevel was informed of his constitutional rights and indicated his understanding of each right by signing the rights form. The police questioned Bevel on two occasions over the course of twenty-four hours. During these two interviews, Bevel gave four different versions of the story but ultimately confessed to the murders.

Although Bevel confessed to murdering Stringfield and Sims, his version of events was contrary to the testimony of both Smith and Dumas. Bevel stated that he and Stringfield had been fighting recently about money that Stringfield believed he was owed and that Bevel feared that Stringfield was going to try and kill him. He said that when he brought Dumas back to the house that night, Stringfield began to get angry, saying that he should have killed Bevel a long time ago. While Dumas and Smith were in opposite bedrooms, the fight escalated until Stringfield was pointing the handgun at Bevel and Bevel had picked up the AK–47 rifle. Then, Stringfield went into his bedroom and, when Bevel heard a clicking noise that sounded like a magazine being loaded into the handgun, Bevel moved towards the room and shot Stringfield when he reached the door. Bevel said the gun went off several times but he did not mean to shoot Smith.

- 4 -

At trial, the State presented the testimony of several forensic and medical experts, who testified regarding the causes of death of Stringfield and Sims and the extensive injuries suffered by Smith. Dr. Jesse Giles, who performed the autopsy of Sims, testified that Sims received a gunshot wound that grazed his chest and exited his arm but that he died as a result of massive trauma due to a gunshot wound to the head. Dr. Aurelian Nicolaescu, who performed the autopsy of Stringfield, testified that he died as a result of a gunshot wound to the head. Both doctors testified that each victim had stippling injuries, which is indicative of being shot at close to intermediate range. The State also presented evidence technicians and crime-scene analysts who discussed bullet fragments, casings, and fingerprints lifted from the scene. In addition, the State introduced the two videotaped interviews with Bevel and letters that Bevel wrote to Dumas from prison, in which he attempted to convince her to change her testimony and lie at trial to save his life.

In his defense, Bevel presented testimony to contradict Smith's version of events. Officer Kenneth Bowen, one of the first officers to arrive at the crime scene, stated that Smith told him that two black males with ski masks committed the crimes. Francis Smith, Smith's mother, stated that she overheard her daughter tell Bevel's brother and his friend in the hospital that the man who committed the murder had on a mask. Finally, Ketrina Bronner, a neighbor of Stringfield, stated that she had a conversation with Smith at a federal courthouse in which Smith said that she did not see who committed the murder.

After the guilt-phase portion of the trial, the jury found Bevel guilty of first-degree murder of Stringfield by discharging a firearm, first-degree murder of Sims by discharging a firearm, and attempted first-degree murder of Smith by discharging a firearm.

Bevel v. State, 983 So. 2d 505, 510-12 (Fla. 2008).

During the penalty phase, the State presented testimony from Detective Kuczkowski, who had investigated a previous armed robbery charge involving Bevel. Id. at 512. After pleading guilty to the lesser-included offense of attempted robbery without a firearm, Bevel was sentenced to one year in county jail for that

crime.  Id. at 512 n.1.  Within a year of being released, Bevel committed the

murders at issue in this case.  Id.

The State also presented penalty phase testimony from Detective Dingee,

"who recounted Bevel's confession that he killed Sims because he would have

been a witness."  Id. at 512.  In addition to offering three victim-impact statements

as further evidence, "the State played the portion of the videotape in which Bevel

stated that he killed Sims because he knew who Bevel was and would tell

Stringfield's brother that he killed Stringfield."  Id.

This Court summarized the evidence presented by Bevel during the penalty

phase as follows:

> In defense, Bevel presented the testimony of several family
> members who described Bevel's poor childhood, the physical abuse
> he suffered and witnessed at the hands of his mother's boyfriend, the
> bond he held with his mother and how her death affected him at the
> age of twelve, his poor relationship with his father who was a heroin
> addict, and his positive relationships with his extended family.  Bevel
> also presented the testimony of Dr. Harry Krop, a psychologist, who
> conducted neuropsychological evaluations and other personality tests
> to evaluate Bevel for competency to stand trial and his mental state at
> the time of the crimes, and to explore his psychological status and
> background to prepare to possibly testify during the penalty phase.
>     Among other things, Dr. Krop testified about Bevel's low full-
> scale IQ of 65, which placed him in the range of mild mental
> retardation; however, he stated that Bevel could not be diagnosed as
> mentally retarded because, based on Bevel's letters and writings from
> prison, he believed Bevel "had a lot of street sense and . . . clearly has
> a higher level of adaptive functioning."  Dr. Krop stated that Bevel's
> mental age is somewhere around that of a fourteen- or fifteen-year-old
> and that he would function well in a structured environment such as
> the general population at prison.  However, on cross-examination, Dr.

> Krop admitted that Bevel was clearly responsible for the crimes he committed; he also appreciated the criminality of the conduct, had no organic brain damage or other serious mental infirmity, and was not suffering from any mental illness at the time of the crime.

Id. at 512-13 (footnote omitted).

The jury recommended the death penalty by a vote of eight to four as to the murder of Stringfield and by a unanimous vote of twelve to zero as to the murder of Sims. Id. at 513. Following the jury's recommendations, the trial court found the prior violent felony aggravating factor applicable to both murders, based on the contemporaneous crimes and the prior attempted robbery, and assigned this aggravating factor "very great weight." Id. As to the murder of Sims, the trial court found the additional aggravating factor that the murder was committed to avoid arrest, assigning this aggravating factor "great weight." Id.

In mitigation, the trial court rejected the statutory age mitigating circumstance, finding that it had not been proven by a preponderance of the evidence since Bevel was twenty-two at the time of the murders and his mental age, according to the trial court, was not significantly lower. Id. The trial court did, however, find the following six nonstatutory mitigating circumstances: (1) Bevel has religious faith and loves his family members (minimal weight); (2) Bevel confessed to the crime (little weight); (3) Bevel exhibited good behavior in jail (very little weight); (4) Bevel exhibited good behavior in court (little weight);

(5) Bevel has an IQ of 65 (little weight); and (6) Bevel struggled with the death of his mother (very little weight). Id. at 513 & n.4.

"The trial court concluded that the aggravating [factors] strongly outweighed the mitigating circumstances as to the murder of Stringfield and that the aggravators far outweighed the mitigators as to the murder of Sims." Id. at 513. "In fact, the trial court noted that either aggravator standing alone would outweigh the mitigators in the murder of Sims." Id. The trial court therefore sentenced Bevel to death for both murders. Id.

On direct appeal to this Court, Bevel raised nine claims: (1) the trial court erred in failing to strike a juror for cause on the asserted ground of favoring law enforcement; (2) the trial court erred in finding that the aggravating factors outweighed the mitigating circumstances; (3) Bevel's death sentences are disproportionate; (4) the trial court erred in denying Bevel's motion arguing that Florida's death penalty statute is unconstitutional because a jury, rather than a judge, must make a unanimous finding as to the aggravators; (5) the trial court erred in the weight assigned to the aggravating factors and mitigating circumstances; (6) the trial court abused its discretion in allowing photographic evidence that was gruesome and unduly prejudicial; (7) the trial court erred in admitting Bevel's confession; (8) the trial court erred in adopting verbatim the State's proposed findings of fact and conclusions of law; and (9) the death penalty

is inappropriate because Bevel's mental age is under that of an eighteen-year-old. Id. at 513 n.5. This Court unanimously rejected all of Bevel's claims and affirmed his murder convictions and death sentences. Id. at 526.

Bevel subsequently filed an initial motion for postconviction relief, pursuant to Florida Rule of Criminal Procedure 3.851, in which he raised the following ten claims: (1) trial counsel was ineffective during the guilt and penalty phases of Bevel's trial; (2) Bevel was deprived of the right to the effective assistance of a mental health expert as required by Ake v. Oklahoma, 470 U.S. 68 (1985); (3) Bevel is ineligible for the death penalty because he is intellectually disabled; (4) the State improperly withheld material evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); (5) Bevel was erroneously denied access to public records; (6) Bevel's death sentences are unconstitutional because the State does not have uniform standards for determining whether to seek the death penalty; (7) Bevel's death sentences are not proportionate; (8) cumulative error deprived Bevel of a fundamentally fair trial; (9) Florida's capital sentencing scheme is unconstitutional in violation of the Sixth and Eighth Amendments to the United States Constitution; and (10) execution by lethal injection is unconstitutional.

The postconviction court held a <u>Huff</u>[1] hearing and thereafter entered an order granting an evidentiary hearing as to three of Bevel's claims: claim 1, pertaining to ineffective assistance of counsel; claim 3, pertaining to intellectual disability; and claim 4, pertaining to <u>Brady</u>. The postconviction court determined that the remaining claims could be decided as a matter of law, with the exception of the cumulative error claim, which it would decide after the evidentiary hearing.

During an evidentiary hearing that spanned four days, Bevel presented testimony from the following thirteen witnesses: Refik Eler (trial counsel for Bevel who was responsible for the guilt phase); Richard Selinger (trial counsel for Bevel who was responsible for the penalty phase); Mike Hurst (private investigator for the defense); Antorio McCray (Bevel's older brother); Laurel French Wilson (an attorney who had represented Bevel in juvenile court); Carl Burden (Bevel's friend); Barbara Jean Fisher (Bevel's aunt); Lavonne McCray (Bevel's uncle); Maria Sardinas (Bevel's foster parent); Gregorio Hector Sardinas (Bevel's foster parent); Dr. Chester Aikens (employer of Bevel's mother); Blanche Juliette Thayer (social worker); and Sara Flynn (mitigation specialist). In addition, expert witness testimony was elicited from four mental health experts: Dr. Harry Krop, the

---

1. <u>Huff v. State</u>, 622 So. 2d 982, 983 (Fla. 1993). The procedure set forth in <u>Huff</u> has since been codified in Florida Rule of Criminal Procedure 3.851(f)(5)(A). <u>See</u> <u>Johnson v. State</u>, 135 So. 3d 1002, 1011 n.4 (Fla. 2014).

defense expert from trial; Dr. Robert Ouaou; Dr. Steven Gold; and Dr. Richard Dudley.

Following the evidentiary hearing, the postconviction court issued an order denying Bevel's motion for postconviction relief. In its order, the postconviction court determined, as a matter of law, that claims 2 (Ake), 5 (public records), 6 (lack of uniform standards), 7 (proportionality), 9 (constitutionality of death penalty statute), and 10 (constitutionality of lethal injection) were without merit. As to claims 1 and 4 (the ineffective assistance of counsel and Brady claims), the postconviction court concluded that Bevel had failed to demonstrate prejudice, and as to claim 3 (the intellectual disability claim), the postconviction court determined that "Bevel's adaptive functioning precludes a diagnosis of mental retardation." Because the postconviction court found no individual error, it also denied claim 8 (the cumulative error claim).

On appeal to this Court, Bevel contends that the postconviction court erred in denying the ineffective assistance of penalty phase counsel claim. He does not challenge the denial of the intellectual disability[2] or Brady claims, nor does he raise

_____

2. While the current appeal was pending in this Court, Bevel filed a motion to permit the filing of a successive motion for postconviction relief in the trial court, indicating his intent to raise a claim based on the United States Supreme Court's decision in Hall v. Florida, 134 S. Ct. 1986 (2014), which invalidated Florida's method of determining whether a defendant in a capital case has an

any substantive issue pertaining to the summarily denied claims.[3]  He has,

however, filed an accompanying petition for a writ of habeas corpus, raising a

claim of ineffective assistance of appellate counsel.  Bevel also argues that he is

entitled to Hurst[4] relief.

## II.  ANALYSIS

We begin by addressing whether Bevel is entitled to postconviction relief as

a result of our decision in Hurst, requiring unanimity in the jury's findings of "the

existence of each aggravating factor that has been proven beyond a reasonable

doubt, the finding that the aggravating factors are sufficient . . . the finding that the

aggravating factors outweigh the mitigating circumstances," and unanimity as to

the jury's final recommendation for death.  202 So. 3d at 44.  We conclude that

intellectual disability.  This Court granted Bevel's motion, thereby permitting him
to file the successive claim while the current appeal continued as scheduled.

3.  In his brief, Bevel made a cursory reference to alleged deficiencies in the
postconviction court's order pertaining to the summarily denied claims.  To the
extent Bevel challenges the merits of the postconviction court's denial of these
claims, that issue is insufficiently pled.  See Wheeler v. State, 124 So. 3d 865, 889-
90 (Fla. 2013) (denying a claim as insufficiently pled where the appellant
"completely failed to make any legal argument to support" the claim).  To the
extent Bevel alleges that the postconviction court's order is procedurally defective,
we deny that claim.

4.  Hurst v. State, 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998 (U.S.
May 22, 2017).  While Bevel's appeal was pending, the United States Supreme
Court decided Hurst v. Florida, 136 S. Ct. 616 (2016), and we decided Hurst on
remand.  The parties filed supplemental briefing addressing the application of
Hurst v. Florida before this Court.

Bevel is entitled to Hurst relief for his death sentence imposed for the murder of

Stringfield, which the penalty phase jury recommended by a vote of eight to four.

However, Bevel is not entitled to Hurst relief for his death sentence imposed for

the murder of Sims, which the penalty phase jury unanimously recommended.

After addressing Bevel's Hurst claim, we then address Bevel's postconviction

claim of ineffective assistance of penalty phase counsel and conclude that Bevel

has demonstrated both deficient performance and prejudice under Strickland.[5]

Thus, we conclude that Bevel is entitled to a new penalty phase based on his

ineffective assistance of counsel claim.  We also address Bevel's habeas petition,

which we conclude lacks a basis for relief.

## A.  **Hurst v. Florida and Hurst**

In Hurst, we explained that "the jury in a capital case must unanimously and

expressly find all the aggravating factors that were proven beyond a reasonable

doubt, unanimously find that the aggravating factors are sufficient to impose death,

unanimously find that the aggravating factors outweigh the mitigating

circumstances, and unanimously recommend a sentence of death."  202 So. 3d at

57-58.  In Mosley v. State, 209 So. 3d 1248 (Fla. 2016), this Court held that Hurst

applies retroactively to death sentences that became final after the United States

_____

5.  Strickland v. Washington, 466 U.S. 668 (1984).

- 13 -

Supreme Court decided <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). Because Bevel's conviction became final after <u>Ring</u>,[6] <u>Hurst</u> applies retroactively to his case. <u>See</u> <u>Mosley</u>, 209 So. 3d at 1283. In light of the jury's nonunanimous recommendation of death for the murder of Stringfield, we cannot conclude beyond a reasonable doubt that the jury made the requisite findings required by <u>Hurst</u>. Nor can we speculate why four jurors determined that death was inappropriate for the murder of Stringfield. Thus, we conclude that the <u>Hurst</u> error in this case as to the Stringfield murder was not harmless beyond a reasonable doubt. Accordingly, we vacate Bevel's sentence of death imposed for the murder of Stringfield.

As to Bevel's death sentence for the murder of Sims, which the penalty phase jury unanimously recommended, we "conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors." <u>Davis v. State</u>, 207 So. 3d 142, 174 (Fla. 2016). In this case, where no aggravating factors have been struck, "we can conclude that the jury unanimously made the requisite factual findings" before it unanimously recommended that Bevel be sentenced to death for the murder of Sims, and we therefore deny relief under <u>Hurst</u> for that death sentence. <u>Id.</u> at 175.

_____

6. Bevel's sentence became final in 2008. <u>See</u> <u>Bevel</u>, 983 So. 2d at 510.

- 14 -

We next consider whether Bevel's penalty phase counsel was ineffective, therefore entitling Bevel to a new penalty phase.

## B. Ineffective Assistance of Penalty Phase Counsel

Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), this Court has explained that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).

To establish the deficiency prong under Strickland, the defendant must prove that counsel's performance was unreasonable under "prevailing professional norms." Morris v. State, 931 So. 2d 821, 828 (Fla. 2006) (quoting Strickland, 466 U.S. at 688). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

As to the prejudice prong of Strickland, this Court has explained:

- 15 -

With respect to those claims alleging ineffective assistance of counsel specifically during the penalty phase, penalty-phase prejudice under the Strickland standard is measured by "whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." Hurst [v. State, 18 So. 3d 975, 1013 (Fla. 2009)]. Under this standard, a defendant is not required "to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter v. McCollum, 558 U.S. 30, 44 (2009) (quoting Strickland, 466 U.S. at 693-94). "To assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence . . .' and 'reweigh[s] it against the evidence in aggravation.' " Id. at 41 (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000)).

Wheeler v. State, 124 So. 3d 865, 873 (Fla. 2013) (alterations in original) (parallel citations omitted). In assessing whether counsel's deficient performance in investigating and presenting mitigation evidence was prejudicial, we must ask "whether, had the jury and trial judge considered the total mitigating evidence presented both at trial and during postconviction proceedings and compared it with the aggravating circumstances," our confidence in the jury's recommendation is undermined. Butler v. State, 100 So. 3d 638, 665 (Fla. 2012).

"[T]his Court's standard of review is two-pronged: (1) this Court must defer to the [trial] court's findings on factual issues so long as competent, substantial evidence supports them; but (2) must review de novo ultimate conclusions on the deficiency and prejudice prongs." Everett v. State, 54 So. 3d 464, 472 (Fla. 2010) (quoting Reed v. State, 875 So. 2d 415, 421-22 (Fla. 2004)). "Thus, under

- 16 -

Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's <u>factual</u> findings." <u>Eaglin v. State</u>, 176 So. 3d 900, 906 (Fla. 2015) (quoting <u>Stephens v. State</u>, 748 So. 2d 1028, 1033 (Fla. 1999)).

**<u>Deficient Performance</u>**

Bevel argues that his penalty phase counsel was deficient in failing to conduct a constitutionally adequate mitigation investigation. In support, he points to the following evidence and records, discovered during postconviction proceedings, that he asserts a reasonable mitigation investigation would have uncovered: evidence that he suffers from brain damage, frontal lobe impairment, and diminished mental capacity; evidence of childhood sexual abuse; evidence of neglect and a poor living environment while growing up; evidence of academic and behavioral struggles in school; evidence of unresolved grief issues following the death of his mother; evidence that Bevel's life dramatically improved while staying with foster parents and then again deteriorated upon leaving foster care; evidence of physical and emotional abuse suffered by Bevel at the hands of victim Stringfield; evidence of Bevel's history of serious alcohol and drug use; and evidence that Bevel's mental disorders affected his mental state at the time of the crime.

During the postconviction evidentiary hearing, penalty phase counsel testified that he had worked on only one prior capital case before representing Bevel during the penalty phase. He conceded that it was "probably correct" that he did not begin his mitigation investigation until August 10, 2005, which was twelve days before the trial began. Counsel's billing records reflected that he spent only 9.5 hours prior to the start of guilt phase jury selection conducting a mitigation investigation, including speaking with Bevel twice; requesting school records; and speaking with Bevel's grandmother, brother, sister, and aunt. He then spent "probably" another 6 to 7 hours investigating mitigation prior to the start of the penalty phase, for a total of 15.5 to 16.5 hours on the mitigation investigation in Bevel's case.

From a review of the evidentiary hearing transcript and the record, it is clear that counsel failed to obtain, or was unaware of, significant records and mitigation evidence that could have assisted in the defense's penalty phase presentation. Indeed, penalty phase counsel conceded, based on the records postconviction counsel established to have been in existence, that he could have done more to investigate mitigation.

These records included, among others, reports from Bevel's time in foster care, a report that Bevel was the victim of childhood sexual abuse, and records from an attorney who represented Bevel during juvenile proceedings. Obtaining

these records, and contacting some of the witnesses who testified in postconviction proceedings that were not contacted prior to the trial, would have enabled penalty phase counsel to emphasize the extent of Bevel's poor living situation with his grandmother, including the dangerous neighborhood plagued by high crime and drugs; the extent of Bevel's academic and childhood behavioral problems and how he never received the help he needed; and how Bevel was not irredeemable but rather a product of his difficult upbringing, based on his demonstrated behavioral improvement while living with his foster parents.

There is little doubt that the quality and depth of the postconviction evidence painted a more complete and troubling picture of Bevel's background than was presented to the jury and the trial court—something postconviction counsel was able to uncover primarily due to the extensive investigation undertaken by mitigation specialist Sara Flynn.

The mental health experts who testified during postconviction proceedings also offered qualitatively more favorable opinions—a fact the State has conceded. For instance, evidentiary hearing testimony from Dr. Ouaou indicated that Bevel suffers from frontal lobe impairment, a history of traumatic brain injury, and diminished mental capacity. Testimony from Drs. Gold and Dudley indicated that Bevel suffers from depression, Post-Traumatic Stress Disorder, and anxiety. This testimony can be contrasted with Dr. Krop's penalty phase testimony, as

summarized by this Court on direct appeal, that Bevel "had no organic brain damage or other serious mental infirmity, and was not suffering from any mental illness at the time of the crime." Bevel, 983 So. 2d at 513.

While a more favorable expert opinion in postconviction generally does not establish deficient performance, because trial counsel is entitled to rely on the evaluations of qualified mental health experts, see Jennings v. State, 123 So. 3d 1101, 1116 (Fla. 2013), it is critical to note that the mental health experts who testified at the evidentiary hearing were provided with additional background information not previously discovered or provided to Dr. Krop—that is, the very records and information penalty phase counsel failed to discover. In fact, Dr. Ouaou testified that some of these records were "key" in forming his opinion.

The breadth of the undiscovered mitigation evidence, combined with this Court's statement on direct appeal that the mitigation presented at trial was "minimal," Bevel, 983 So. 2d at 525, strongly supports a conclusion that penalty phase counsel conducted an unreasonable mitigation investigation. See, e.g., Coleman v. State, 64 So. 3d 1210, 1221 (Fla. 2011) ("A reasonable investigation in Coleman's case would have revealed substantial mitigation. Had [trial counsel] performed a reasonable investigation and uncovered the abovementioned mitigation, he would have been compelled to 'explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.' "

(quoting Rompilla v. Beard, 545 U.S. 374, 387 (2005))); see also Wiggins v. Smith, 539 U.S. 510, 524 (2003) ("[I]nvestigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence . . . .' " (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 C (1989)). This conclusion is bolstered by the very little amount of total time counsel spent preparing for the penalty phase and by penalty phase counsel's own admission that he did not start the mitigation investigation until just twelve days before trial.

Based on the failure to discover available records and social history that would have assisted both in the penalty phase presentation and in the mental health evaluation undertaken by Dr. Krop, this is not a case in which penalty phase counsel cannot be deemed deficient because he or she made a reasonable strategic decision to forego the presentation of certain evidence. See Simmons v. State, 105 So. 3d 475, 508 (Fla. 2012) ("The United States Supreme Court has rejected the suggestion that a decision to focus on one potentially reasonable trial strategy is justified by a 'tactical decision' when counsel does not conduct a thorough investigation of the defendant's background."). In fact, penalty phase counsel actually testified that much of the undiscovered mitigation would have been useful and consistent with his trial strategy.

For these reasons, we conclude that the totality of the evidence introduced during postconviction proceedings demonstrates that penalty phase counsel conducted an unreasonable mitigation investigation. See State v. Lewis, 838 So. 2d 1102, 1113 (Fla. 2002) ("[T]he obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated—this is an integral part of a capital case."). Accordingly, Bevel's penalty phase counsel was deficient. We next consider whether Bevel has established the prejudice prong of Strickland.

### **Prejudice**

The postconviction court concluded that Bevel had failed to meet the prejudice prong of Strickland because of the strong aggravating factors and overwhelming evidence in support of Bevel's death sentences. However, our analysis of the prejudice prong is not merely an evaluation of whether strong aggravation was present, but also considers whether the totality of the available mitigation evidence, when reweighed against the evidence in aggravation, establishes a probability sufficient to undermine confidence in the death sentence. See Wheeler, 124 So. 3d at 873. As we explained in Simmons, in evaluating the prejudice prong of a defendant's ineffective assistance of counsel claim, "this Court has rejected the notion that the existence of" an especially weighty aggravator "will defeat the need for a new penalty phase when substantial mitigation existed that was not presented to the jury." 105 So. 3d at 509; see also

- 22 -

Blackwood v. State, 946 So. 2d 960, 976 (Fla. 2006) (affirming postconviction court's determination that "in light of the available mental health mitigation evidence, trial counsel's failure to . . . present such evidence to the jury constituted ineffective assistance of counsel during the penalty phase").

Therefore, this Court's inquiry in evaluating the prejudice prong of Strickland focuses, in part, on the effect that the additional mitigation would have had on the jury's recommendation of death had the mitigation originally been presented to the jury. Because we have already concluded that Bevel is entitled to Hurst relief for his death sentence for the murder of Stringfield, our inquiry focuses on the effect that the additional mitigation would have had on the jury's unanimous recommendation of death for the murder of Sims. In determining whether this Court's confidence in the outcome is undermined, we have considered whether the jury's death recommendation would have been different had the jury heard the unpresented mitigation evidence. For example, where the jury's vote recommending death was dependent on one juror's vote, our confidence has been undermined when counsel was deficient in presenting mitigation to the jury, because "[t]he swaying of the vote of only one juror would have made a critical difference." Phillips v. State, 608 So. 2d 778, 783 (Fla. 1992). As this Court emphasized in Ferrell v. State, 29 So. 3d 959 (Fla. 2010), "counsel's deficiency in failing to investigate and present . . . mitigation evidence deprived [the defendant]

of a reliable penalty proceeding such that this Court's confidence in the outcome is undermined. This is particularly the case in light of the close jury vote of seven to five." Id. at 986 (citation omitted).

Thus, this Court unquestionably focuses on the effect the unpresented mitigation could have had on the jury's ultimate recommendation. For instance, in Hurst v. State, 18 So. 3d 975 (Fla. 2009), in addressing whether there was deficient performance and prejudice, we reasoned that "[b]ecause this mitigation was not made available for the jury or the trial judge to consider before the death sentence was imposed, our confidence in the imposition of the death penalty in this case is undermined." Id. at 1015. After our more recent decision in Hurst, 202 So. 3d 40, where we determined that a reliable penalty phase proceeding requires that "the penalty phase jury must be unanimous in making the critical findings and recommendation that are necessary before a sentence of death may be considered by the judge or imposed," 202 So. 3d at 59, we must consider whether the unpresented mitigation evidence would have swayed one juror to make "a critical difference." Phillips, 608 So. 2d at 783.

In this case, Bevel offered a more compelling picture of a "poor childhood" during the postconviction proceedings. As we have detailed above, there was unpresented evidence of substantial mitigation related to Bevel's childhood sexual abuse, mental disorders that affected Bevel's mental state at the time of the crime,

and brain damage Bevel sustained. Therefore, after "reweighing the evidence in aggravation against the mitigation evidence presented during the postconviction evidentiary hearing and the penalty phase, our confidence in the outcome of the penalty phase trial is undermined," Walker v. State, 88 So. 3d 128, 141 (Fla. 2012), because "[t]he swaying of the vote of only one juror would have made a critical difference." Phillips, 608 So. 2d at 783. Accordingly, Bevel has met the prejudice prong under Strickland and we are compelled to vacate his death sentence for the murder of Sims and remand for a new penalty phase.

### C. Habeas Petition

Bevel's habeas petition raises a claim of ineffective assistance of appellate counsel, which hinges on the argument that the State committed prosecutorial misconduct during guilt phase and penalty phase closing statements. Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for a writ of habeas corpus. Chavez v. State, 12 So. 3d 199, 213 (Fla. 2009) (citing Freeman v. State, 761 So. 2d 1055, 1069 (Fla. 2000)). To grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must resolve the following two issues:

> [W]hether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

- 25 -

Bradley v. State, 33 So. 3d 664, 684 (Fla. 2010) (quoting Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986)). Under this standard, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Anderson v. State, 18 So. 3d 501, 520 (Fla. 2009) (quoting Freeman, 761 So. 2d at 1069). Importantly, "[i]f a legal issue 'would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Walls v. State, 926 So. 2d 1156, 1175-76 (Fla. 2006) (quoting Rutherford v. Moore, 774 So. 2d 637, 643 (Fla. 2000)).

"Ordinarily, to preserve a claim based on improper comment, counsel has the obligation to object and request a mistrial." Bright v. State, 90 So. 3d 249, 259 (Fla. 2012) (quoting Nixon v. State, 572 So. 2d 1336, 1340 (Fla. 1990)). In this case, with the exception of one particular reference during the penalty phase to the murders as "brutal and savage," trial counsel did not offer a contemporaneous objection to any of the challenged comments. Thus, in order to prevail on a claim of error on direct appeal, Bevel would have had to demonstrate fundamental error—that is, that the unobjected-to comments "reache[d] down into the validity of the trial itself to the extent that a verdict of guilty . . . could not have been

obtained without the assistance of the alleged error." Scott v. State, 66 So. 3d 923, 929 (Fla. 2011) (quoting Poole v. State, 997 So. 2d 382, 390 (Fla. 2008)).

Bevel points to three allegedly improper categories of prosecutorial argument. First, he contends that the prosecutor made impermissible references to his bad character during the penalty phase, specifically pointing to comments in which the prosecutor referenced Bevel's "true character." The full context of these prosecutorial arguments, which Bevel nowhere set forth in his petition, was as follows:

> And then you also look at the defendant's character and you've got a little bit of that yesterday, didn't you? I mean, the last witness you heard from, Dr. Krop, kind of gave you a little sample of what the defendant's true character is. Talked about him as a child, how he started his life of crime. You might recall the testimony was about I think he was ten, 11, 12, somewhere in that range wherein he resorted [to] violence on a mother that was trying to come to the aid of the son that he got into a fight with. Somebody said something about slapping the boy and he did, and then the boy tried to defend himself so what did he do? [Bevel] got a gun.
> . . . .
> And then he came up with Dr. Krop, I'm kind of jumping over there but he talked about with Dr. Krop, okay, minimizing this, you know, the first one was because Mr. Stringfield, I thought, was going to go for a gun, et cetera. Then the second one, well, it was just an accident, I didn't really mean to shoot Feletta Smith, it just happened. And the third one, what about Phillip Sims, the 13 year old boy? I don't want to talk about that. Of course, makes perfect sense, he eliminated him. But again he denied it and said two masked men.
> Then in terms of disagreements with the victim, he thought the victim was going to kill him. Then he said he heard a gun magazine. We're talking about the murder of Garrick Stringfield.
> So his story then is to the police well, okay, I did do it but you know what, there have been some threats in the past, and it was

something outside, we had some words, and you know, they make this big deal about well, he had a 45. Yeah, he had it and you've got the photographs of it. It's on the other side of the table, I mean, he caught this guy red-handed in terms of surprising him, didn't give Mr. Stringfield a chance. Doesn't that show his true character?

. . . .

And Dr. Krop testified as an expert in terms of his experience, his studies regarding the death penalty, people on death row, et cetera. I believe he testified what 42 percent, maybe 50 percent of the people there have a low IQ. And what's the key points? This doctor who was there to help him, what was the defendant's attitude throughout? Doesn't that show his true character? Because that's what you need to focus on, his true character.

Now, Dr. Krop did talk about that based on the history in terms of talking to the family and based on talking to the defendant, his mother died and that's tragic. She had an accident. I think there was some he said defendant felt, I forget what, you rely on what you remember Dr. Krop saying, but—and I think I asked Dr. Krop, does that mean how many people have parents that are unfortunately killed, forget about violent crime, just die, how many of those people go on to become murderers? Obviously as the impression you would be left with is, oh, that must explain why he did what he did. Well, most people that have access to losing a loved one, a parent, don't go out and kill people like this defendant did. So it's not like a license that he's got the ability to do this. It's a mitigator you should consider the fact that his mother died. But then how much weight do you give to that?

Bevel recognizes that none of these alleged errors were preserved for appellate review by contemporaneous objection, but nevertheless argues that the improper comments amounted to fundamental error. However, Bevel cannot demonstrate that any of the comments was error in the first place, let alone fundamental error. Indeed, as the full context of the comments demonstrates, the allegedly improper "character" references were in fact comments directed

specifically at evidence presented to the jury regarding proposed mitigation. Several of the comments explicitly referenced penalty phase testimony from Dr. Krop, who testified regarding Bevel's antisocial personality and childhood behavioral issues. As fair comments based on the evidence, these comments were not improper. See Valentine v. State, 98 So. 3d 44, 58 (Fla. 2012).

Second, Bevel contends that the prosecutor erroneously inflamed the passions of the jury by referring to the murders as "brutal and savage." The State acknowledges that this was a poor choice of words and could be seen as improper inflammatory language. However, the comments were isolated—occurring only once during the guilt phase (unobjected-to) and once during the penalty phase (objected-to). Even if the prosecutor's one reference each during the guilt and penalty phases to the murders as "brutal and savage" was improper, we conclude that these isolated references would not have inflamed the passions of the jury to such an extent as to influence its verdict or sentencing recommendation.

Finally, Bevel asserts that the State committed improper "Golden Rule" violations, asking the jury to place itself in the shoes of the attempted murder victim through the following commentary:

> She [victim Feletta Smith] was shot numerous times, terrified, I think she described it as a burning sensation. She thought she was going to die. And she still has a continuing fear in terms of at the hospital and even when the police got there because [the] defense made a big deal, you had all these police officers with guns and they were there to protect you, she was still in fear of what the defendant

had done. Forever traumatized, how much weight should you give to this as part of this aggravator, how her life had forever been changed.

And then again he gave different versions as to what happened, talked about shot Stringfield, the rifle kept shooting, it was kind of an accident. He even talked about with Dr. Krop about that, well, that was an accidental shooting, I didn't really mean to shoot her. You didn't have any problem saying, pardon my language, shut up bitch, and keep shooting but just an accident, the trigger just kept pulling.

Now, I'm finished with the aggravator in terms of prior violence, in terms of each murder being used against it. And I submit to you on behalf of the State of Florida this aggravator should be given great weight and would justify the imposition of the death penalty.

Bevel's argument of error is without merit. The prosecution never invited the jury to place itself in the victim's place or to imagine her pain. Rather, the State recounted the facts, as reflected by the victim's testimony, in the context of arguing why the prior violent felony aggravating circumstance should be given great weight.

In sum, most of the challenged comments were not improper and, to the extent the "brutal and savage" references were improper, there was no reversible error. Appellate counsel cannot be deemed deficient for failing to raise a meritless argument. See Walls, 926 So. 2d at 1175-76. Appellate counsel raised numerous issues on direct appeal and was not required "to present every conceivable claim." Davis v. State, 928 So. 2d 1089, 1126 (Fla. 2005).

## III. CONCLUSION

Based on the foregoing, we deny Bevel's petition for a writ of habeas corpus but reverse the postconviction court's denial of Bevel's motion for postconviction relief. Accordingly, we vacate Bevel's death sentences and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., concurs in part and dissents in part with an opinion, in which
POLSTON, J., concurs.
LAWSON, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

CANADY, J., concurring in part and dissenting in part.

I agree that Bevel's habeas petition should be denied, but I disagree with the decision to reverse the postconviction court's order denying relief and to remand for a new penalty phase. I disagree with the majority for three reasons. First, I would conclude that the requirements of Hurst v. Florida, 136 S. Ct. 616 (2016), were satisfied because the jury unanimously found the existence of an aggravating circumstance as evidenced by its contemporaneous, unanimous verdicts for the murder of the second victim and the attempted murder of the third victim. Second, I adhere to my view that Hurst v. Florida should not be given retroactive application. Lastly, I would conclude that Bevel is not entitled to relief because he

- 31 -

failed to establish at least one of the Strickland prongs in each of his ineffective assistance of counsel claims.  The postconviction court's denial of relief should therefore be affirmed.

## I.

I adhere to my view that Hurst v. Florida—like Ring v. Arizona, 536 U.S. 584 (2002)—only requires that the jury find the existence of an aggravating circumstance that renders a defendant eligible for a death sentence.  See Hurst v. State, 202 So. 3d 40, 77 (Fla. 2016) (Canady, J., dissenting) (noting "the Hurst v. Florida Court's repeated identification of Florida's failure to require a jury finding of an aggravator as the flaw that renders Florida's death penalty law unconstitutional"), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017); see also Hurst v. Florida, 136 S. Ct. at 624 ("Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional.").  Bevel's jury did make a unanimous finding regarding the existence of an aggravating circumstance—that Bevel was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.  The jury unanimously determined that this aggravating circumstance was proven beyond a reasonable doubt as reflected in its separate verdicts finding Bevel guilty of the contemporaneous first-degree murder

of the second victim and of the contemporaneous attempted first-degree murder of the third victim. Thus, I would conclude that no Hurst v. Florida error occurred.

## II.

Even if Hurst v. Florida error were present in this case, I would deny Bevel relief. As I have previously explained, Hurst v. Florida should not be given retroactive effect. See Mosley v. State, 209 So. 3d 1248, 1285-91 (Fla. 2016) (Canady, J., concurring in part and dissenting in part).

## III.

I disagree with the majority's analysis of Bevel's ineffective assistance of counsel claims. The majority summarizes Bevel's claims as follows: "Bevel argues that his penalty phase counsel was deficient in failing to conduct a constitutionally adequate mitigation investigation." Majority op. at 17. But Bevel actually argues that

> counsel provided ineffective assistance in the penalty phase of trial by conducting his mitigation investigation at the "eleventh hour" and failing to discover Mr. Bevel's organic brain damage, frontal lobe impairment, "extreme emotional disturbance," "capacity to conform his conduct to the requirements of the law," sexual abuse, PTSD, depression, anxiety, and other significant mental health and social and environmental mitigation and subsequently hire experts, and present these mitigators to the jury, in violation of Bevel's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to effective representation and a fair trial.

Appellant's Initial Brief at 56, Bevel v. State, No. 14-770 (Fla. Oct. 27, 2014). In my view, Bevel's claims cannot be lumped into a single ineffective assistance of

- 33 -

counsel claim; instead, the allegations should be divided into separate subclaims and analyzed individually. This is so because counsel may have rendered deficient performance with respect to some of the allegations but not others, and Bevel may have been prejudiced by some of counsel's actions but not others.

The majority justifies its conclusion that trial counsel rendered deficient performance in the penalty phase as follows:

> From a review of the evidentiary hearing transcript and the record, it is clear that counsel failed to obtain, or was unaware of, significant records and mitigation evidence that could have assisted in the defense's penalty phase presentation. Indeed, penalty phase counsel conceded, based on the records postconviction counsel established to have been in existence, that he could have done more to investigate mitigation.
>
> These records included, among others, reports from Bevel's time in foster care, a report that Bevel was the victim of childhood sexual abuse, and records from an attorney who represented Bevel during juvenile proceedings. Obtaining these records, and contacting some of the witnesses who testified in postconviction proceedings that were not contacted prior to the trial, would have enabled penalty phase counsel to emphasize the extent of Bevel's poor living situation with his grandmother, including the dangerous neighborhood plagued by high crime and drugs; the extent of Bevel's academic and childhood behavioral problems and how he never received the help he needed; and how Bevel was not irredeemable but rather a product of his difficult upbringing, based on his demonstrated behavioral improvement while living with his foster parents.
>
> . . . .
>
> The mental health experts who testified during postconviction proceedings also offered qualitatively more favorable opinions—a fact the State has conceded. For instance, evidentiary hearing testimony from Dr. Ouaou indicated that Bevel suffers from frontal lobe impairment, a history of traumatic brain injury, and diminished mental capacity. Testimony from Drs. Gold and Dudley indicated that Bevel suffers from depression, Post-Traumatic Stress Disorder, and

anxiety. This testimony can be contrasted with Dr. Krop's penalty phase testimony, as summarized by this Court on direct appeal, that Bevel "had no organic brain damage or other serious mental infirmity, and was not suffering from any mental illness at the time of the crime."

While a more favorable expert opinion in postconviction [proceedings] generally does not establish deficient performance[] because trial counsel is entitled to rely on the evaluations of qualified mental health experts, it is critical to note that the mental health experts who testified at the evidentiary hearing were provided with additional background information not previously discovered or provided to Dr. Krop—that is, the very records and information penalty phase counsel failed to discover. In fact, Dr. Ouaou testified that some of these records were "key" in forming his opinion.

Majority op. at 18-20 (citations omitted).

The only records identified by the majority that trial counsel "failed to obtain, or was unaware of," are "reports from Bevel's time in foster care, a report that Bevel was the victim of childhood sexual abuse, and records from an attorney [(Laurel French Wilson)] who represented Bevel during juvenile [delinquency] proceedings." Majority op. at 18.

The records referred to by the majority as "foster care" records are not records from a time when Bevel was in foster care through the Department of Children and Families Services or its predecessor agency, the Department of Health and Rehabilitative Services (HRS); they are actually from a time when Bevel was adjudicated delinquent and committed to a residential program in the Department of Juvenile Justice (DJJ). According to the record, after a judge committed Bevel to DJJ in 1994, he "was admitted to the White Foundation

- 35 -

Individual Family Treatment Home Program." So instead of being sent to a typical DJJ program in a camp-like or prison-like setting, he was sent to live with a "foster" family, the Sardinas, on August 8, 1994.

These records[7] indicate that while Bevel initially had a tough time when living with the Sardinas, his behavior and grades eventually improved and he completed the program satisfactorily. The records show that Bevel was with the Sardinas for six months but only reached the upper level of improvement during the final month.

Postconviction counsel provided these records to postconviction expert Dr. Gold, who relied on them to conclude that Bevel does not have Antisocial Personality Disorder (ASPD)—which Dr. Krop testified at the penalty phase Bevel does have—because ASPD is an enduring pattern of behavior, but when Bevel was with the Sardinas, his grades and behavior improved.

Laurel French Wilson, an attorney who represented Bevel on one occasion when he was twelve years old and charged with possession of cocaine with intent to sell, grand theft, criminal mischief, and a violation of community control, provided her file to postconviction counsel. In pertinent part, the file contains a "Child Guidance Center Psychosocial Evaluation Interview" form, which was

---

7. The parties have referred to these records alternatively as foster care records, records from the Sardinas, and records from the White Foundation.

based on an interview of Bevel, conducted on March 25, 1994. The referral source was HRS, but the report indicates that there was no HRS involvement. Ms. Wilson testified at the evidentiary hearing that the evaluation was done by a school guidance counselor. Trial counsel testified that he did not recall having reviewed this document.

The evaluation interview form indicates that at the time of the interview, Bevel's peer relations, family relations, and communication skills were good and that his psychosexual functioning was appropriate. He denied previous or current abuse of himself, his mother, father, and siblings. He was in "regular class" and had not repeated any grade levels. His mother was killed in a car accident in May 1993, and at the time of the interview, Bevel was living with his grandmother and having sporadic contact with his father. He was dressed appropriately, his activity level in the interview was appropriate, he was cooperative, and he was oriented in all three spheres. His mood, affect, speech, sleep, and eating habits were normal. His thought processes were rational in content and form. His thought organization was logical. His insight was realistic. His judgment was limited. His emotional tone seemed normal. He accepted responsibility for his behaviors. He was on probation for an assault he denied committing. He was sent to a different school due to numerous referrals for disrupting class. The evaluation interview form listed Oppositional Defiant Disorder (ODD) as an Axis I DSM diagnosis and a

medical ICD-9-CM diagnosis. Bevel now argues that counsel rendered ineffective assistance in failing to learn he was diagnosed with ODD and present that fact as mitigation at the penalty phase.

During the penalty phase, Dr. Krop—with express agreement from Bevel after consultation with his attorneys—testified about Bevel's ASPD diagnosis. Dr. Krop also testified that Bevel probably had Attention Deficit Hyperactivity Disorder (ADHD), that he had been recommended for treatment for Post-Traumatic Stress Disorder (PTSD), that his intellectual ability was in the mildly mentally retarded range, that he had cognitive deficits, that he had behavioral problems in school, that he was depressed at times, that he did not have good coping skills, that he turned to drugs and crime at a young age, that he was living in the streets at a young age, that his mother's drinking during her pregnancy with him affected his intellect, that his judgment was almost totally compromised at various times in his life, and that he progressed fairly well when he was placed in structured environments, including DJJ commitment programs. Dr. Krop also testified at the penalty phase that he reviewed records regarding Bevel's involvement with DJJ (which started when Bevel was rather young), including predisposition reports and psychological evaluations.

With regard to Bevel's claim that counsel was ineffective for failing to obtain "reports from Bevel's time in foster care," Bevel failed to establish that

- 38 -

counsel rendered deficient performance. There was no evidence presented at the evidentiary hearing that trial counsel failed to review these records in preparation for the penalty phase. When asked whether he reviewed the records from Bevel's time with the Sardinas, counsel responded, "I don't recall specifically. Again, I turned over the file to you. If it was there, then I had them obviously." Trial counsel did recall speaking to the Sardinas in the course of preparing for the penalty phase. Trial counsel specifically recalled that Mr. Sardina told him that when Bevel was living with the Sardinas he was able to follow the rules, obey authority, not commit any crimes and that he did better in school, was a good boy, and was doing well.

Bevel asserts that the point of the records was to show that he does better in structured environments and therefore does not have ASPD. But Dr. Krop was aware, and even testified at the penalty phase, that Bevel does better in structured environments, yet he still found that Bevel met the criteria for ASPD. Dr. Krop testified at the penalty phase that for Bevel, "structured programs as a juvenile and the jail [as an adult] are actually healthier environments for him and he does not exhibit the antisocial behavior [in those environments], he only exhibits the antisocial behavior when he's in the community." Dr. Krop also specifically discussed Bevel's time with the Sardinas at the penalty phase. The State asked Dr. Krop, "Didn't [Bevel] have a problem with disrupting his peers in class and wasn't

he suspected for certain things [when he was with the Sardinas]?" Dr. Krop responded,

> He would typically, yes, he would typically have problems when he would start in one of the programs and then he would tend to do better.
> If you looked at the progress reports in each of the individual programs that he was in it would pretty much be a similar pattern.

The records from when Bevel was with the Sardinas were indeed progress reports from one of the programs to which Bevel was committed as a juvenile. Thus, Dr. Krop's testimony at the penalty phase established that he had these records at the time of the penalty phase; he either obtained them on his own or was provided them by trial counsel, who simply did not remember having done so by the time of the evidentiary hearing. Further, contrary to Bevel's assertion and Dr. Gold's testimony, these records do not prove that Bevel does not have ASPD. These records were compiled when Bevel was thirteen years old, but, as the experts testified, one of the requirements for an ASPD diagnosis is a pervasive pattern of disregard for and violation of the rights of others since the age of fifteen. Even if we were to ignore the evidence which establishes that Dr. Krop was provided with these records prior to the penalty phase and assume that trial counsel rendered deficient performance by failing to obtain and provide them to Dr. Krop, because Dr. Krop did testify at the penalty phase that Bevel does

better in a structured environment and because the records would not have precluded Dr. Krop from diagnosing Bevel with ASPD, Bevel has not established prejudice.

With regard to Bevel's claim that counsel was deficient for failing to obtain Ms. Wilson's file—specifically, the March 25, 1994, "Child Guidance Center Psychosocial Evaluation Interview" form, which was the only relevant item in the file—Bevel has not established deficiency. It was not per se unreasonable under prevailing professional norms for counsel to not obtain or attempt to obtain all of the files from all of the defense attorneys who handled each of Bevel's twenty-one referrals[8] to DJJ. Most of them almost certainly had been destroyed or discarded. It was just by happenchance that Ms. Wilson retained her file for many years.

Moreover, there was no evidence presented to establish that trial counsel did not review the March 25, 1994, evaluation interview form. Trial counsel testified at the evidentiary hearing only that he did "not specifically recall seeing that document." And Dr. Krop was not asked whether he reviewed this document or whether having been aware that Bevel was diagnosed with ODD at the age of twelve would have changed his opinions

_____

8. A referral to DJJ is made when a juvenile is charged with a crime in Florida. It is similar to an arrest in the adult criminal justice system.

in any way. In any event, as previously explained, Bevel's ODD diagnosis at the age of twelve would not have precluded a subsequent diagnosis of ASPD. Thus, Bevel has not established that he was prejudiced by counsel's failure to obtain Ms. Wilson's file. Further, although Bevel complains that trial counsel did not call an expert to testify about his ODD diagnosis at the penalty phase, even one of his own postconviction experts, Dr. Dudley, testified at the evidentiary hearing that he disagreed with the diagnosis. The totality of the evidence regarding Bevel's ODD diagnosis is therefore that the diagnosis is disputed. Any mitigation provided by such disputed evidence would have been minimal at best.

The report relating to Bevel being a victim of sexual abuse as a child indicates that in 1987, a six-year-old male victim and a three-year-old female victim were sexually battered by a juvenile relative. The male was apparently Bevel, and the female was his sister. The report states that a juvenile cousin performed oral sex on Bevel and tried to get Bevel to reciprocate, but Bevel resisted. Other family members in the house at the time denied that this incident could have happened because at the time it allegedly occurred, there were five children (including two children who were "older") playing together and the adults were nearby and checking on the children periodically. Despite these denials, there was physical evidence

that the three-year-old was digitally penetrated as she claimed, and the juvenile cousin was arrested. Whether he was charged with or convicted of a crime against Bevel is unknown.

A friend and coworker of Bevel's deceased mother testified at the evidentiary hearing that Bevel's mother told him that Bevel was sexually abused by a family member when he was a young boy—apparently in reference to the incident described above. According to the coworker friend, Bevel's mother told him that she talked to Bevel about the abuse but did not get him any therapy. Bevel has repeatedly denied that the incident occurred, even during the postconviction proceedings. There is no evidence that this abuse was anything other than an isolated incident.

The abuse report was noted in a chronology of Bevel's life prepared by predecessor trial counsel, Alan Chipperfield, which included the allegation of abuse and stated that "the report of abuse was 'closed without classification with ongoing services provided by a non-HRS agency.' " Trial counsel testified at the evidentiary hearing that he reviewed Chipperfield's chronology in preparation for the penalty phase. When asked at the evidentiary hearing whether he was "aware that there is a 1987 abuse registry report that has Bevel listed as a victim of sexual abuse," trial counsel stated, "I don't recall." Because there is evidence that Chipperfield

either obtained the report or was at least aware of its contents and no evidence that trial counsel did not have the report, we cannot draw the conclusion that trial counsel was deficient simply for failing to discover this report. Nor can we conclude that trial counsel's performance was deficient for failing to discover the sexual abuse allegations by speaking with Bevel's deceased mother's coworker friend.

Even assuming that trial counsel performed deficiently by failing to offer the evidence of sexual abuse as mitigation, Bevel is not entitled to relief because he has not established that he was prejudiced by counsel's failure. The fact that the jury did not hear that Bevel may have been abused on one occasion by a juvenile cousin does not undermine confidence in the outcome in this case, a double—nearly a triple—homicide, in which one of the victims Bevel executed was a child. Moreover, because Bevel continues to deny this incident occurred, the presentation of the allegations in the report at a new penalty phase would likely be rebutted by testimony that Bevel and his family members deny that any abuse occurred and would therefore have little, if any, mitigating value.

It appears that the majority has also found that trial counsel was ineffective because while the postconviction experts testified that Bevel suffers from frontal lobe impairment, a history of traumatic brain injury, diminished mental capacity,

depression, PTSD, and anxiety, Dr. Krop did not offer the same opinions at the penalty phase. The majority notes that more favorable expert opinions in postconviction proceedings generally do not establish deficient performance because trial counsel is entitled to rely on the evaluations of qualified mental health experts, but it nonetheless concludes that trial counsel was deficient for failing to provide Dr. Krop with records and "additional background information not previously discovered," some of which were " 'key' " for one of the postconviction experts, Dr. Ouaou, in forming his opinion. Majority op. at 20.

The majority does not indicate which records or background information it believes should have been, but were not, provided to Dr. Krop. And there is no evidence in the record that any of the postconviction experts had any records or background information that Dr. Krop did not. The only arguable support for the majority's finding is that when postconviction expert Dr. Ouaou was asked at the evidentiary hearing, "[W]as Dr. Krop provided all of the records, bench notes, school records that you have?" and Dr. Ouaou replied, "It's my impression that he was not, and some of those were key, I believe, in forming my opinion." Dr. Ouaou gave no explanation for his "impression" that Dr. Krop did not have all the same records that he was provided.

We cannot rely on Dr. Ouaou's "impression" to conclude that trial counsel rendered deficient performance. Moreover, the majority appears to speculate that

- 45 -

had Dr. Krop been furnished with whichever records and background information the majority has found he was not provided, he would not have testified at the penalty phase that Bevel "had no organic brain damage or other serious mental infirmity, and was not suffering from any mental illness at the time of the crime," majority op. at 20 (quoting Bevel v. State, 983 So. 2d 505, 513 (Fla. 2008)), and instead would have offered opinions similar to those of the postconviction experts. But even assuming that there were "key" records and background information with which Dr. Krop was not provided, there was no evidence presented at the evidentiary hearing that had Dr. Krop been provided with those records and background information, he would have changed his opinions and offered different testimony at the penalty phase.

Further, even though Dr. Ouaou opined at the evidentiary hearing that Bevel's capacity to conform his conduct to the requirements of the law was substantially impaired at the time of the murders due to frontal lobe dysfunction—which Dr. Ouaou said might have been caused by a traumatic brain injury that might have occurred when Bevel was hit in the head as a child or as a result of Bevel's mother's drinking while she was pregnant with him—he stated that his diagnosis was only "hypothetical" without brain imaging, which was not done. Dr. Ouaou further stated that it is possible that Bevel's actions in committing the murders were due to ASPD rather than brain damage. Thus, the evidence

- 46 -

presented at the evidentiary hearing that Bevel suffers from brain damage is tenuous at best. Bevel's claim is nothing more than a claim that trial counsel did not find the most favorable experts, which is a claim that we have repeatedly rejected. See Brant v. State, 197 So. 3d 1051, 1069 (Fla. 2016) ("[W]e have repeatedly stated that trial counsel is not deficient because the defendant is able to find postconviction experts that reach different and more favorable conclusions than the experts consulted by trial counsel." (citing e.g., Diaz v. State, 132 So. 3d 93, 113 (Fla. 2013); Wyatt v. State, 78 So. 3d 512, 533 (Fla. 2011); Asay v. State, 769 So. 2d 974, 986 (Fla. 2000))). I would therefore conclude that Bevel is not entitled to relief because he has not established that counsel's performance was deficient.

Regarding Bevel's childhood, the majority states:

> Obtaining these records,[9] and contacting some of the witnesses who testified in postconviction proceedings that were not contacted prior to the trial, would have enabled penalty phase counsel to emphasize the extent of Bevel's poor living situation with his grandmother, including the dangerous neighborhood plagued by high crime and drugs; the extent of Bevel's academic and childhood behavioral problems and how he never received the help he needed; and how Bevel was not irredeemable but rather a product of his difficult upbringing, based on his demonstrated behavioral improvement while living with his foster parents.

---

9. This reference refers generically to the "foster care" records, the sexual abuse report, Ms. Wilson's juvenile file, and "other" records, which the majority has not identified. Again, the record does not establish that trial counsel did not have the documents that are identified.

There is little doubt that the quality and depth of the postconviction evidence painted a more complete and troubling picture of Bevel's background than was presented to the jury and the trial court—something postconviction counsel was able to uncover primarily due to the extensive investigation undertaken by mitigation specialist Sara Flynn,

majority op. at 18-19, and "Bevel offered a more compelling picture of a 'poor childhood' during the postconviction proceedings," majority op. at 24. But without identifying any records that trial counsel did not have or specifying the witnesses that trial counsel was deficient for failing to interview, the mere fact that trial counsel could have "emphasized the extent of" or "offered a more compelling picture of" Bevel's "poor childhood" does not necessarily render his performance deficient.

Further, Bevel has not established that he was prejudiced by counsel's presentation of the circumstances of his childhood. This Court summarized some of the evidence presented by Bevel during the penalty phase as follows:

In defense, Bevel presented the testimony of several family members who described Bevel's poor childhood, the physical abuse he suffered and witnessed at the hands of his mother's boyfriend, the bond he held with his mother and how her death affected him at the age of twelve, his poor relationship with his father who was a heroin addict, and his positive relationships with his extended family.

Bevel, 983 So. 2d at 512. Other evidence presented in mitigation at the penalty phase included the following: Bevel's mother had alcoholism and drank heavily while pregnant with Bevel; there was domestic violence between Bevel's mother

and father, including an incident during which Bevel's mother stabbed Bevel's father in the chest; Bevel's father abandoned him, tried to commit suicide, and died of complications from AIDS; the odds were against Bevel his whole life; Bevel received no counseling regarding his mother's tragic and untimely death; Bevel's mother's boyfriend verbally and physically abused Bevel, his mother, and his sister, and, more specifically, that he would get drunk and beat them, sometimes with a belt, and one time he kicked Bevel so hard that Bevel could not breathe and had to be taken to the hospital; Bevel's mother would go to the bar and leave Bevel with the abusive boyfriend; Bevel had bad grades, behavior problems, and probably ADHD; Bevel should have been in special education; Bevel had no positive male role model and turned to living in the streets, using and selling drugs, and a life of crime at a young age; Bevel was often depressed because he was not taught adequate coping skills; Bevel's judgment was almost totally compromised at various times in his life; Bevel was suspicious of others because when he let down his guard one time, he was shot; Bevel progressed fairly well when in structured environments; a criminal element was present everywhere in Bevel's environment and that was the modeling that he was exposed to; and Bevel never received counseling for PTSD, which was always recommended.

The majority states that through the extensive investigation undertaken by mitigation specialist Sara Flynn in preparation for the postconviction proceedings,

postconviction counsel was able to uncover evidence that painted a more complete and troubling picture of Bevel's background than was presented during Bevel's penalty phase and sentencing proceedings. At the evidentiary hearing, Flynn was asked, "[W]hat mitigating factors would you have given defense counsel?" Flynn responded that she would have provided trial counsel with: the different types of abuse Bevel endured and was exposed to; the genealogical factors; the substance abuse; the fact that Bevel was sexually exploited in the neighborhood where he grew up; that Bevel had been sexually abused as a young boy; that there was nobody to protect Bevel from males in the neighborhood who were exploiting him; that Bevel had depression and PTSD, which were not treated other than by his use of marijuana; that Bevel started using marijuana when he was twelve years old; and that Bevel received head injuries. Most of the mitigating factors that Flynn described are cumulative to the mitigation presented at the penalty phase. The only items in her list that were noncumulative are the sexual abuse, which was previously discussed, "the genealogical factors," and the fact that Bevel was sexually exploited in the neighborhood.

The only "genealogical factor" that Flynn mentioned at the evidentiary hearing was the fact that Bevel's mother was stabbed by her first husband, years before Bevel was born, which caused her to start drinking. But other witnesses testified that Bevel's mother began drinking because her second husband, Bevel's

father, was using heroin. And one witness even testified that Bevel's mother started drinking just after high school. Even assuming that being stabbed by her first husband triggered Bevel's mother's drinking, that fact is not relevant or mitigating. Trial counsel presented evidence at the penalty phase that Bevel's mother drank while she was pregnant with Bevel and during Bevel's childhood. That information was mitigating but what might have triggered her drinking years before Bevel was born was not. Counsel was not deficient for failing to discover or present evidence that Bevel's mother was stabbed, nor was Bevel prejudiced by the absence of this "genealogical factor" at his penalty phase.

As to Flynn's assertion that Bevel was sexually exploited in his neighborhood, Flynn testified that she learned that victim Stringfield would recruit young men to drive him around town because he was an alcoholic and did not want to get charged with DUI, but he was also a drug dealer and needed transportation to conduct his dealings. Flynn said Stringfield "did not pay [the young men] anything, but gave them privileges, and used them for his own sexual pleasure. And he also did the same thing with females." But Flynn did not provide any basis for this knowledge nor did she say that this happened to Bevel. When asked on cross-examination whether Bevel reported being sexually abused by Stringfield, Flynn said, "He did not deny it or admit it." Counsel was not deficient for failing to discover from an unnamed source that Stringfield exploited boys and girls in the

- 51 -

neighborhood. And because the bad character of a victim is not mitigating, there was no prejudice to Bevel.

Lastly, I would point out that although the majority states that trial counsel's billing records reflect that he spent "a total of 15.5 to 16.5 hours on the mitigation investigation in Bevel's case," majority op. at 18, these numbers fail to take into account any of the work done by predecessor counsel. Alan Chipperfield's chronology shows that a much more thorough mitigation investigation was done than is accounted for by the majority.

In addition to denying Bevel habeas relief, for the reasons explained above, I would also affirm the trial court's order denying postconviction relief and conclude that Bevel is not entitled to Hurst relief.

POLSTON, J., concurs.

LAWSON, J., concurring in part and dissenting in part.

I concur with the majority's decision to vacate Bevel's death sentence for the Stringfield murder and remand for a new penalty phase based upon Hurst error that is not harmless beyond a reasonable doubt. See Okafor v. State, No. SC15-2136, slip op. at 15 (Fla. June 8, 2017) (Lawson, J., concurring specially). However, I would not grant Bevel a new penalty phase for the Smith murder because, as explained in Justice Canady's concurring in part and dissenting in part opinion, Bevel's counsel was not ineffective during the penalty phase.

An Appeal from the Circuit Court in and for Duval County,
John Bradford Stetson, Judge - Case No. 162004CF004525AXXXMA
And an Original Proceeding – Habeas Corpus

Frank Tassone of Tassone & Dreicer, LLC, Jacksonville. Florida; and Rick A. Sichta, Susanne K. Sichta, and Joe Hamrick of The Sichta Firm, LLC., Jacksonville, Florida,

for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Carine L. Mitz, Assistant Attorney General, Tallahassee, Florida,

for Appellee/Respondent

Stephen K. Harper, Clinical Professor, Death Penalty Clinic, Florida International University College of Law, Miami, Florida; and Stuart L. Hartstone, Acting Executive Director, Florida Capital Resource Center, Miami, Florida,

for Amici Curiae The Florida Capital Resource Center and The Death Penalty Clinic at Florida International University College of Law

Robert C. Josefsberg of Podhurst Orseck, P.A., Miami, Florida; Robert G. Kerrigan of Kerrigan, Estess, Rankin, McLeod & Thompson, LLP, Pensacola, Florida; Karen M. Gottlieb of Florida Center for Capital Representation, Miami, Florida; and Sonya Rudenstine, Gainesville, Florida,

for Amici Curiae Justice Harry Lee Anstead, Judge Rosemary Barkett, Martha Barnett, Talbot D'Alemberte, Hank Coxe, Justice Gerald Kogan, Florida Association of Criminal Defense Lawyers, Florida Capital Resource Center, and Florida Center for Capital Representation